NATIONAL LABOR RELATIONS BOARD
v. BEMIS BRO. BAG CO.

No. 14020.

United States Court of Appeals
Fifth Circuit.

Aug. 6, 1953.

Norton J. Come, Attorney, A. Norman Somers, Asst. Gen. Counsel, David P. Findling, Assoc. Gen. Counsel, George J. Bott, Gen. Counsel, and Ruth V. Reel, Attorney, N. L. R. B., all of Washington, D. C., for petitioner.

Frank A. Constangy, Atlanta, Ga., Brewer Dixon, Talladega, Ala., Dixon, Wooten & Boyett, Talladega, Ala., for respondent.

Before BORAH, RUSSELL, and STRUM, Circuit Judges.

RUSSELL, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order directing the Bemis Bro. Bag Company to bargain with the union representative of its employees at its Talladega, Alabama plant with reference to the terms and conditions of employee occupancy of company owned houses. Following a complaint filed by such union representative, the United Textile Workers of America, A.F.L., the Board, accepting the facts found by the trial examiner, but overruling his legal conclusions, determined that the bag company had committed an unfair labor practice by refusing to bargain with the union representative upon this question.

The complaint arose following a notice posted by the respondent bag company that it intended to restore rentals of its houses to the 1949 rate. The union protested this unilateral action and insisted that the matter of rentals and occupancy of such houses was a mandatory subject of collective bargaining. The respondent-employer asserted that a majority of the employees in the bargaining unit resided outside of the company village and that in view of all of the circumstances pertaining to housing conditions in the area the matter solely concerned a landlord and tenant relationship which it considered a non-bargainable issue. During the discussions the union representative and the employer negotiated a comprehensive collective agreement which did not refer to the matter of company housing.

At the hearing before the trial examiner only two witnesses testified, for the respondent, M. B. Waits, assistant to the General Manager of respondent, and for general counsel, Julian A. Vickers, one of respondent's employees, who testified that his brother had experienced some difficulty in securing housing facilities when he became an employee of the bag company. Other facts were developed by exhibits. The trial examiner, considering the facts, found them insufficient to establish that housing conditions in the company's hous-

ing project was a matter of mandatory bargaining.[1] He determined that grievance procedure established by the contract already negotiated afforded grounds for relief against any discrimination against union employees regarding housing conditions if such should ever be attempted by the employer and concluded that the respondent had not refused to bargain with the union in good faith and recommended dismissal of the complaint.

The Board, apparently of the opinion that the terms and conditions of company housing are *ipso facto* a subject of mandatory bargaining, found that the respondent-owned and operated housing units "are a mandatory subject of collective bargaining under the Act; [and] that the rental of such units is an integral part of the subject of company housing;" and accordingly that the respondent's refusal to bargain concerning the housing rentals was a violation of Section 8(a)(5) of the National Labor Relations Act. In so adjudging the Board cited and relied upon its former rulings "that employer-provided living accommodations are encompassed within the terms 'wages' and 'conditions of employment'[2] where such accommodations are an integral part of the employment relation",[3] and N. L. R. B. v. Hart Cotton Mills, 4 Cir., 190 F.2d 964, and found in the present case no reason warranting a departure from its "previous holdings that company housing is a proper subject of collective bargaining."

The Board rejected the conclusion of the trial examiner that the subject of rentals here was a matter for adjustment as a grievance under the provisions of the collective agreement. No party at interest contests the overturning of this feature of the trial examiner's conclusion.

We find the record insufficient in facts to authorize the Board's conclusion in this case.

It appears from the record that the respondent, a bag manufacturing company, owns a tract of some 3,000 acres of land which lies immediately adjacent to the city limits of Talladega, Alabama, a city of some 13,800 population. On this land is located its plant and the dwelling units which are here involved. It also has a dairy farm, a garage and filling station, a library, grocery store, school and recreational facilities. The area immediately surrounding the plant, the dwelling houses and these other facilities is known as Bemiston Village. These are located in the immediate area adjoining the city limits of Talladega, and are approximately two miles from the center of the town. There are 195 houses containing approximately 295 to 300 dwelling units. The bargaining unit comprises from 750 to 900 employees, of whom 325 to 340 live in company houses and occupy about 250 of the 300 dwelling units. The remaining units, except for those rented by two ministers who serve

---

1. "The record further shows that new employees experienced little difficulty in securing adequate housing in the nearby area during the past several years and fails to show that the rentals for such housing is higher than rents charged by the Respondent for similar accommodations.

"Since only a minority of the employees in the bargaining unit are tenants in the Respondent's housing development, and the record fails to indicate a housing shortage exists in the area at rentals comparable to the rents charged by the Respondent, it is my opinion that the rights of such employee may be amply protected under the comprehensive grievance procedure provided by the provisions of the current contract in evidence."

2. §§ 8(a) (5), 8(b) (3) and 9(a) of the National Labor Relations Act, being §§

158(a) (5), 158(b) (3) and 159(a), Title 29 U.S.C.A. respectively; 61 Stat. 140 et seq.

3. Elgin Standard Brick Mfg. Co., 90 N.L. R.B. 1467, 1488, 1491; Hart Cotton Mills, Inc., 91 N.L.R.B. No. 130; Weyerhaeuser Timber Co., 87 N.L.R.B. 672.

The Board also noted that it had consistently held that company housing is a "condition of employment" within the meaning of Section 8(a) (3) of the Act, "which prohibits discrimination 'in regard to hire or tenure of employment or any term or condition of employment.'" Abbott Worsted Mills, Inc., 36 N.L.R.B. 545, enforced, 1 Cir., 127 F.2d 438; Great Western Mushroom Co., 27 N.L.R.B. 352; Industrial Cotton Mills Co., Inc., 50 N.L. R.B. 855; Indianapolis Wire-Bound Box Co., 89 N.L.R.B. 617; W. T. Carter & Brother, 90 N.L.R.B. 2020.

the village, and by the manager of the retail store located in the village, are rented to clerical and supervisory employees of the company. Thus all units are leased to employees except for the ministers and the store manager. Approximately 65% of the employees in the bargaining unit live outside the village. They either own their own homes, or are renting from landlords other than the respondent. The houses involved rent from $13.25 for a two-room unit to $25.50 for a six-room unit. The record fails to show whether these rentals are more or less than those charged for comparable houses in the vicinity rented by others. Talladega, Alabama is not a controlled rent area. It has been the respondent's policy for many years to rent the dwelling units to employees making applications in the order in which applications are received. There is a waiting list of some 80 applicants. Rents are not deducted from the employees' pay, though this is authorized by the lease. This item, like charges for milk, gasoline, coal, etc., is billed to the employees and paid by them. The plant is served by a public transportation system operating from Talladega, which meets each shift at the respondent's plant. According to the results of a survey made by the company of the availability of private transportation to its employees, only 48 out of more than 1,000 employees are dependent upon public transportation to and from work. The remaining employees travel by automobiles which they either own, or share as passengers.

There are vacant dwellings available for rental in the community and the testimony of respondent's assistant General Manager, credited by the trial examiner, is that if respondent's housing units should suddenly become unavailable there would be no difficulty in finding accommodations for all of these tenants in the Talladega area.

Under these circumstances, respondent urges that the incidents of tenancy and the terms of occupancy of company houses are no different from those of the sale of gasoline and oil and services afforded by the company filling station, or of milk by the dairy, or the sale of seconds of cloth, or sales and purchases of coal, as is provided by the employer. Counsel for the petitioner counters by noting the difference in the treatment accorded the several ventures in that the filling station and dairy sell gas and milk to outsiders, as well as to employees, and such sales are not accompanied by the same type of plant control as is manifested in connection with respondent's houses. It is said that the primary distinction, however, is the provisions of the dwelling leases which specifically recognizes that "the premises rented are a part of the plant facilities."

■ The lease contains the language just quoted and also other provisions which manifest an intention to restrict the occupants of the dwelling units to the employees of the respondent and to require immediate vacation thereof in the event the lessee ceases to be an employee. These conditions attach to 35% of the respondent's employees and become operative upon the employee occupants because the employer will have no tenants other than employees and because the employee voluntarily assumes the lease. It is not safe to determine the question of whether company housing is a subject matter of compulsory bargaining as a condition of employment solely upon the basis of the conditions of the lease, for if the matter is only thus made bargainable, the lease provisions could conceivably be changed, or even entirely abrogated, by bargaining, and thus the source of power be destroyed by its exercise. That which was thought to justify bargaining in the first instance would no longer exist. The question must be determined upon some other consideration, for if the terms and conditions of occupancy of company housing are subject to compulsory bargaining as "conditions of employment" they can become neither more nor less so by reason of the nature and effect of any conditions imposed by the employer solely in his capacity as a landlord. We must look elsewhere for solution to the question.

■ The language of the statute, which requires bargaining with "respect to wages, hours, and other terms and conditions of employment," § 8(d), or in "respect to rates of pay, wages, hours of employment, or other conditions of employment," § 9(a),

clearly contemplates matters and things which arise out of, and may properly be considered a part of, the employment relation,—the business in which the employer and the employee participate as necessary and essential components in the furtherance of the enterprise. The Act contemplates the relationship in the work of the enterprise and the engagement of the employer and employee in its prosecution. Conditions under which this employment is, or should properly be, carried on, including those generally accepted as provisions proper to the discharge of the mutual obligations of the employer and employees, or even those which might be deemed fairly debatable which relate to the actual business operation, are within the provisions of the statute as "conditions of employment."

■ "Wages" may be a direct or indirect compensation or emolument for the work performed. If it is shown that rentals are so low that they are in fact a partial compensation such rentals would properly fall within the statutory requirement. In such a case, as said in N. L. R. B. v. Hart Cotton Mills, 4 Cir., 190 F.2d 964, 972, in many mills such houses are a necessary part of the enterprise and where they are maintained by the employer and "rented at such rates to the employees as to represent a substantial part of their remuneration" they become a subject of bargaining. This reasoning also underlies the decisions in Inland Steel Co. v. N. L. R. B., 7 Cir., 170 F.2d 247, 12 A.L.R.2d 240, and W. W. Cross & Co. v. N. L. R. B., 1 Cir., 174 F.2d 875, cited by counsel for the Board in support of its position here. It is true, of course, that living standards and conditions may well be said to have a direct connection with a person's well being and efficiency, but this does not establish that an employee's living expenses or means of residence are conditions of employment. Indeed, if so, it would seem to result that no matter where, or how, the employee lived such items, or means of securing them, would be conditions of employment and they would apply as well to the two-thirds of the respondent's employees who do not occupy company-owned houses as to the one-third who do.

It is, of course, true that there are situations where the employee may not have freedom of choice in securing living accommodations. This may result either from express requirement of the employer or where other housing is unavailable and which requires occupancy of company housing if there is to be any employment. Where this situation exists, the terms and conditions of occupancy or tenancy can well be said to be a condition of employment. However, before such occupancy and its consequences becomes a condition of employment there must be some necessity, either imposed by the employer or by the force of circumstances, which requires the employee to subject himself to the condition of occupancy of company housing.

In this case the evidence that other adequate housing is available in the community is not contradicted. There is no evidence that the rentals charged by the respondent are in any degree less than those charged for comparable housing in the vicinity. In these circumstances the fact that the employer confines the rental of its houses to employees does not alone make the conditions of tenancy a condition of employment, nor, where there is no compulsion, either by express requirment or resulting in fact from circumstances which in reason require the employee to live in a company house, the conditions of tenancy of such houses which a minority of the employees may, but are not required to, occupy is not a condition of employment within the contemplation or purpose of the statute. The element of necessity is of course not material as to features of the employer-employee relationship which inhere in the actual employment,—the carrying on of the business. These concern and relate to the business, the employment, directly, and not incidentally, as does the company housing now for consideration under the facts of this case. One concerns a business operation. The other pertains to living conditions during off-hours when the employee is free to pursue his personal life as he may prefer.

■ The brief for the Board recites the genesis and status of the mill village as a necessary adjunct of the mill enterprise.

We can recall instances where the village is an essential part of the business operation. We have in mind others where the company-owned houses have been disposed of and subsequently tenanted by non-employees without any interruption or detriment to the business enterprise.[4] We think each case must be determined upon its particular facts. On this record, which fails to show that rentals are so low as to be partial remuneration for services and, therefore, in effect, wages, or, for any reason save individual choice why one-third of the employees occupy company housing, we are unable to hold that the terms and conditions of such occupancy are comprehended within the statute's designation of "wages" or "other conditions of employment."

We find the Board's order without sufficient support in the facts and accordingly deny the petition for its enforcement.

Enforcement denied.

4. In some cases it would seem that business improvement has followed the abandonment of the mill village.