# UNITED STATES *v.* EMBASSY RESTAURANT, INC., ET AL.

No. 174.   Argued January 22, 1959.—Decided March 9, 1959.

*John F. Davis* argued the cause for the United States. On the brief were *Solicitor General Rankin, Assistant Attorney General Rice, Melva M. Graney* and *George F. Lynch.*

*Richard H. Markowitz* argued the cause for the Welfare Funds, respondents.   With him on the brief was *Charles A. Rothman.*

*W. Randolph Montgomery* filed a brief for the National Association of Credit Management, Inc., as *amicus curiae,* in support of the United States.

*Jacob Sheinkman, Herbert Ferster* and *Mortimer Horowitz* filed a brief for the Amalgamated Clothing Workers of America et al., as *amici curiae,* in support of respondents.

MR. JUSTICE CLARK delivered the opinion of the Court.

The sole issue involved here is whether contributions by an employer to a union welfare fund which are required by a collective bargaining agreement are entitled, in bankruptcy, to priority as being "wages . . . due to workmen" under § 64 (a)(2) of the Bankruptcy Act, as

amended.[1]  Both the trial court, 154 F. Supp. 141, and the Court of Appeals, 254 F. 2d 475, held that such contributions enjoyed priority. This resulted in a conflict with the Court of Appeals for the Second Circuit, *Local 140 Security Fund* v. *Hack*, 242 F. 2d 375, in view of which we granted certiorari  358 U. S. 811

The facts are undisputed. Embassy Restaurant, Inc., was bound in collective bargaining agreements with Local Unions 111 and 301. The agreements related to hours, wages and other conditions of employment. Under these agreements Embassy was obligated to contribute to the trustees of the welfare funds of Locals 111 and 301 $8 per month per full-time employee. The welfare plans were organized to maintain "life insurance, weekly sick benefits, hospital and surgical benefits" and other advantages for members of the locals. Trustees administered each plan under a formal trust agreement and were authorized to formulate and establish the conditions of eligibility for benefits, control all the funds received, collect all contributions, and in their "sole discretion" to handle all legal proceedings incident thereto.  Title to all of the funds, property and income was placed in the trustees exclusively and no employee or anyone claiming under him had any right whatsoever in the plan or any part thereof. In the

---

[1] 30 Stat. 563, § 64, as amended, 11 U. S. C. (Supp. V) § 104 (a) (2), provides:

"(a) The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment, shall be . . . (2) wages . . . not to exceed $600 to each claimant, which have been earned within three months before the date of the commencement of the proceeding, due to workmen, servants, clerks, or traveling or city salesmen on salary or commission basis, whole or part time, whether or not selling exclusively for the bankrupt; . . . (4) taxes legally due and owing by the bankrupt to the United States or any State or any subdivision thereof: . . ."

bankruptcy proceeding the trustees filed proofs of a claim for unpaid contributions due by Embassy, and asserted a second priority for all amounts that had accrued during the three months immediately preceding the bankruptcy. This priority was disallowed by the Referee but, on review, it was granted by both the trial court and the Court of Appeals. We have concluded that such contributions are not entitled to such priority in payment.

At the outset we point out that "The broad purpose of the Bankruptcy Act is to bring about an equitable distribution of the bankrupt's estate. . . ." *Kothe* v. *R. C. Taylor Trust,* 280 U. S. 224, 227, and that "if one claimant is to be preferred over others, the purpose should be clear from the statute." *Nathanson* v. *Labor Board,* 344 U. S. 25, 29.[2] Moreover, if the contributions are placed in the wage priority class, they will likewise be rendered nondischargeable under § 17 of the Act,[3] resulting in their remaining outstanding debts of the bankrupt if the assets of the estate are insufficient to discharge them for three months prior to the bankruptcy.

The trustees attempt to bring contributions within this preferred class by claiming them to be "wages . . . due to workmen." This class of claims has been given a preferred position in the Bankruptcy Act for over 100 years,[4] long before welfare funds played any part in labor negotiations. True, the Congress has amended the Act, but such amendments have been few and guarded ones, such as raising the ceiling on the amount permitted,[5] shifting

---

[2] See also *Kuehner* v. *Irving Trust Co.,* 299 U. S. 445, 452; *Sampsell* v. *Imperial Paper Corp.,* 313 U. S. 215, 219.

[3] 30 Stat. 550, as amended, 11 U. S. C. § 35 (a) (5).

[4] The Act of August 19, 1841, c. 9, 5 Stat. 445, established a third priority for those who had performed "labor as an operative" of the bankrupt.

[5] *E. g.,* Act of May 27, 1926, c. 406, § 15, 44 Stat. 666.

the relative priorities [6] and enlarging the class to salesmen, clerks, etc.[7] If it had wished to include contributions, Congress could easily have included them at any of these times. On the contrary, however, the purpose of Congress has constantly been to enable employees displaced by bankruptcy to secure, with some promptness, the money directly due to them in back wages, and thus to alleviate in some degree the hardship that unemployment usually brings to workers and their families. Evidence of this purpose is found in a 1934 amendment to the Bankruptcy Act.[8] In that year, Congress amended § 63 to allow workmen's compensation claims as provable debts. In awarding them priority, however, Congress relegated these claims to a seventh priority in contrast to the then fourth priority of wages.[9] Only four years later, Congress abolished the priority status of these compensation claims, though it continued them as provable debts under § 63, 11 U. S. C. § 103 (a)(6). It is therefore evident that not all types of obligations due employees from their employers are regarded by Congress as being within the concept of wages, even though having some relation to employment. Moreover, such action indicated the care Congress has exercised in regard to the protection it has granted "wages . . . due to workmen."

Let us examine the nature of these contributions. They are flat sums of $8 per month for each workman. The amount is without relation to his hours, wages or productivity. It is due the trustees, not the workman, and the latter has no legal interest in it whatsoever. A workman cannot even compel payment by a defaulting employer. Moreover it does not appear that the parties to the col-

---

[6] *E. g.*, Act of June 22, 1938, c. 575, § 64, 52 Stat. 874, 11 U. S. C. § 104.

[7] *E. g.*, Act of June 15, 1906, c. 3333, 34 Stat. 267.

[8] Act of June 7, 1934, c. 424, 48 Stat. 924.

[9] *Id.*, 923.

lective agreement considered these welfare payments as wages. The contract here refers to them as "contributions." Finally, Embassy's obligation is to contribute sums to the trustees, not to its workmen; it is enforceable only by the trustees who enjoy not only the sole title, but the exclusive management of the funds.

It is contended, however, that since "unions bargain for these contributions as though they were wages" and industry likewise considers them "as an integral part of the wage package," they must in law be considered "wages." This approach overlooks the fact that we deal with a statute, not business practice. Nor do we believe that holdings that various fringe benefits are wages under the N. L. R. A.[10] or the Social Security Act[11] are apposite. We construe the priority section of the Bankruptcy Act, not those statutes. It specifically fixes the relative priority of claims of classes of creditors. Here that class is "wages . . . due to workmen."

The contributions here are not "due to workmen," nor have they the customary attributes of wages. Thus, they cannot be treated as being within the clear, unequivocal language of "wages . . . due to workmen" unless it is clear that they satisfy the purpose for which Congress established the priority. That purpose was to provide the workman a "protective cushion" against the economic displacement caused by his employer's bankruptcy.[12] These payments, owed as they are to the trustee rather than to the workman, offer no support to the workman in periods of financial distress. Furthermore, if the claims of the trustees are to be treated on a par with wages, in a case where the employer's assets are insufficient to pay

---

[10] *Inland Steel Co.* v. *Labor Board,* 170 F. 2d 247, 251 (contributions to an employee pension plan).

[11] *MacPherson* v. *Ewing,* 107 F. Supp. 666 (sick pay).

[12] *In re Victory Apparel Mfg. Corp.,* 154 F. Supp. 819, 822; *Blessing* v. *Blanchard,* 223 F. 35, 37.

all in the second priority, the workman will have to share with the welfare plan, thus reducing his own recovery.

Respondents argue that precedent allows the priority to be asserted by one other than the workman himself. We are cited to *Shropshire, Woodliff & Co. v. Bush,* 204 U. S. 186, and *United States* v. *Carter,* 353 U. S. 210. In *Shropshire,* wages due a workman had been assigned by him, and the assignee was seeking the wage priority enjoyed by his assignor. In allowing the claim to have priority, the Court said:

> "When one has incurred a debt for wages due to workmen, . . . that debt . . . is entitled to priority . . . .
>
> .   .   .   .   .
>
> "The character of the debts was fixed when they were incurred, and could not be changed by assignment," 204 U. S., at 189,

and also, that "The priority is attached to the debt and not to the person of the creditor . . . ." *Ibid.* Application of these principles to the facts here helps respondents not at all; the obligation to make contributions, when incurred, was to the trustees, not to the workmen. The debt was never owed the workmen. Furthermore, assignability of wage claims as in *Shropshire,* may benefit the bankrupt's employees, who are thus enabled to obtain their money sooner than they might by waiting out the bankruptcy procedure.

Nor does the *Carter* case, *supra,* support the granting of a priority to these contributions. There we dealt with the Miller Act,[13] which granted to every person furnishing labor or material the right to sue on the contractor's payment bond "for the sum or sums justly due him." The contractor defaulted and the trustees of a welfare fund similar to that involved here sued on the bond for recovery

---

[13] 49 Stat. 793, 40 U. S. C. §§ 270a–270d.

of contributions "justly due." Our opinion did not hold that contributions were part of "wages . . . due to workmen." In fact we pointed out that the trust agreement provided that the contributions "shall not constitute or be deemed to be wages." The basis of the opinion was, that the Miller Act "does not limit recovery on the statutory bond to 'wages,'" *id.*, at 217. The Act having the broad protective purposes of securing all claims that are "justly due," we held that the trustees might recover. In short, though the contributions were not wages, they were "justly due" as a claim within "the purposes of the Miller Act." Under the Bankruptcy Act, however, not all claims "justly due" have priority. They must be within a class, such as "wages . . . due to workmen." The claims here are not. If this class is to be so enlarged, it must be done by the Congress.

The judgment is

*Reversed.*

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS concur, dissenting.

I believe payments made by employers to union welfare funds are "wages . . . due to workmen . . . ," under the Bankruptcy Act's priority section.[1] The history of the section is one of continuous congressional expansion. Priority for the "full amount of the wages due" on account of "any labor as an operative in the service of any bank-

---

[1] § 64, 30 Stat. 563, as amended, 11 U. S. C. § 104. The question has caused considerable difficulty in the federal courts. Compare, *e. g.*, the opinions below in this case, 254 F. 2d 475, 154 F. Supp. 141 and *In re Otto,* 146 F. Supp. 786, with *Local 140 Security Fund* v. *Hack,* 242 F. 2d 375; *In re Brassel,* 135 F. Supp. 827; *In re Victory Apparel Mfg. Corp.,* 154 F. Supp. 819. Similarly commentators have split. Compare, *e. g.*, Notes, 19 Ga. B. J. 107; 66 Yale L. J. 449; 44 Va. L. Rev. 995; 57 Mich. L. Rev. 403, with Notes, 34 Chi.-Kent L. Rev. 235; 42 Minn. L. Rev. 295.

rupt" was first granted in the 1841 Bankruptcy Act; it was limited to $25.[2] The Bankruptcy Acts of 1867 and 1898 increased the sum available to each claimant and broadened the coverage of the priority beyond "operatives" or "workmen" to "workmen, clerks or servants."[3] In 1906 Congress brought still more workers into the protected category by defining the group as "workmen, clerks, travelling or city salesmen, or servants."[4] The priority was once again increased, now to $600, in 1926.[5]

The Chandler Act passed in 1938 raised the workers' priority to second behind expenses of administration and ahead of federal and local taxes. At the same time its scope was further broadened to cover "workmen, servants, clerks, or travelling or city salesmen on a salary or commission basis, whole or part-time, whether or not selling exclusively for the bankrupt."[6] Finally, in 1956, Congress took occasion to guard against narrow interpretation of the class of workers covered by adding to the priority section of the Chandler Act the words "and for the purposes of this clause, the term 'travelling or city salesmen' shall include all such salesmen, whether or not they are independent contractors selling the products or services of the bankrupt on a commission basis, with or without a drawing account or formal contract."[7]

This last change in the priority section was the sole subject of a very short Act passed by Congress. Like most of the earlier changes, it was enacted after court decisions barring some workers from the protected class or indi-

---

[2] Act of August 19, 1841, 5 Stat. 445.

[3] Act of March 2, 1867, 14 Stat. 529; Act of July 1, 1898, 30 Stat. 563.

[4] Act of June 15, 1906, 34 Stat. 267.

[5] Act of May 27, 1926, 44 Stat. 667.

[6] Act of June 22, 1938, 52 Stat. 874.

[7] 70 Stat. 725, 11 U. S. C. (Supp. V) § 104.

cating that others might be barred.[8]   We should, I think, be warned by the foregoing history of the wage priority section against niggardly interpretations of the language used in that section.

The Court argues, however, that payments to welfare funds are neither "wages" nor "due to workmen." It is hard for me to see how they could not be "wages." The payments are certainly not gifts.   As was stated less than a year ago by a Senate Committee, which had made an extended study of plans such as those here involved, "regardless of the form they take, the employers' share of the costs of these plans or the benefits the employers provide are a form of compensation."[9]   Courts have long held that compensation for services rendered is a valid definition of "wages" both in the priority section of the Bankruptcy Act and in other contexts.[10]   This is certainly in accord with the customary meaning of the word.   It appears, moreover, that unions and employees consider such payments as the equivalent of wages and

---

[8] See, e. g., In re Scanlan, 97 F. 26; In re Greenewald, 99 F. 705; In re Kominers, 252 F. 183; In re Collin, 18 F. Supp. 848; In re Clover Dairies, Inc., 42 F. Supp. 1006; In re Herbert Candy Co., 43 F. Supp. 588. In recommending the latest change the House Judiciary Committee stated ". . . language in some court cases has been confusing . . . [T]here is language from which one might infer that a salesman who was a 'separate contractor' could not qualify." H. R. Rep. No. 921, 84th Cong., 1st Sess. 2.

[9] S. Rep. No. 1440, 85th Cong., 2d Sess. 4. The Committee also called attention to the fact that "In little more than a decade private employee welfare and pension plans have grown from relatively small significance to a position where approximately 84 million persons are depending in some manner upon the benefits which they promise." Id., at 3.

[10] E. g., In re Gurewitz, 121 F. 982; Glandzis v. Callinicos, 140 F. 2d 111; National Labor Relations Board v. Bemis Bro. Bag Co., 206 F. 2d 33, 37. See also Note, 19 Ga. B. J. 107.

that they have been treated as wages in other statutes.[11] In fact, where such treatment has seemed undesirable, Congress has *expressly* excluded them from the category.[12] Of course, a word need not mean the same thing in different statutes, but the meaning attributed in one Act is far from irrelevant to the interpretation of another.

It cannot be argued that a sum paid by an employer for a worker's services loses its status as wages merely because it is used to purchase insurance benefits.[13] For the Bankruptcy Act has as yet authorized no investigation of how a worker spends his money to determine if he is entitled to a priority for it. And in all events insurance payments would not seem to be the type of expenditure which Congress would discourage.

It is also hard for me to imagine how the fact that the moneys are paid to parties other than the workmen is in any way connected with the question of whether the payments are wages, whatever its relevance might be to whether the sums are "due to workmen." This is especially true in the light of *Shropshire, Woodliff & Co. v. Bush,* 204 U. S. 186, which held that moneys due an assignee of the worker were entitled to priority as wages. The Government admits that if a formal assignment had been made here, wage status might be granted. It does not explain, however, how the lack of a formal assignment can change payments from "wages" to some-

---

[11] See, *e. g., Inland Steel Co. v. National Labor Relations Board,* 170 F. 2d 247, 251. See also Note, 66 Yale L. J. 449, 458, 460.

[12] 68A Stat. 32, 26 U. S. C. (Supp. IV) § 106; 68A Stat. 417, 26 U. S. C. (Supp. IV) § 3121 (a); 68A Stat. 447, 26 U. S. C. (Supp. IV) § 3306 (b)(2). Cf. *Brown v. Maryland,* 12 Wheat. 419, 438, ". . . the exception of a particular thing from general words, proves that, in the opinion of the lawgiver, the thing excepted would be within the general clause had the exception not been made . . . ."

[13] See *In re Otto,* 146 F. Supp. 786, 790; *In re Ross,* 117 F. Supp. 346.

thing else or make granting a priority less in line with congressional policy.[14]

The question of whether the payments are "due to workmen" is on its face somewhat more difficult. But to my way of thinking, the correct answer has been made easy by prior cases in this Court. In the *Shropshire* case, the Court said, "The priority is attached to the debt and not to the person of the creditor; to the claim and not to the claimant. The act does not enumerate classes of creditors and confer upon them the privilege of priority in payment, but, on the other hand, enumerates classes of debts as 'the debts to have priority.'" 204 U. S., at 189. It then held that an assignee of a worker had priority since the debt was wages due to workmen.

Even if it could be meaningfully argued that in *Shropshire* the money was at one time due to workmen, and therefore remained so after assignment, while here it never was due to them, we are, I think, precluded from that position unless we depart from the reasoning of *United States* v. *Carter,* 353 U. S. 210. That case construed § 2 (a) of the Miller Act, 49 Stat. 794, 40 U. S. C. § 270b (a), which provides that "Every person who has furnished labor . . . and who has not been paid in full . . . shall have the right to sue on [a] payment bond . . . for the sum or sums justly due him." The Court held that, for the purposes of the Miller Act, payments to welfare funds are, "as much 'justly due' to the employees who have earned them as are the wages payable directly to them in cash." 353 U. S., at 220. In fact, the Court stated that trustees of the welfare fund have an even better right to sue than most assignees since

---

[14] The Court notes that workmen's compensation claims were at one time given priority by Congress and were subsequently removed. As compensation rights are not contracted for in exchange for labor I do not see how their disposition is relevant to the problem in this case.

40

the trustees, unlike the usual assignee, sue for the benefit of the workers. *Ibid.* I cannot see why the Bankruptcy Act should be construed differently from the Miller Act on the question of whether welfare fund contributions are due to workmen. This is especialy true since the policies of the relevant provisions of the two Acts are quite similar.

Finally it seems to me undesirable to make a distinction in this area between payments on assignment and payments in trust. At best it would let the carrying out of congressional policy depend on the skill with which unions prepare legal documents, and on the various state laws covering the validity of wage assignments. At worst it would give priorities to assignees of the workmen, usually creditors, while denying them to insurance funds for their benefit. Unless we are prepared to repudiate what we said in the *Carter* and *Shropshire* cases, I think § 64 (a)(2) of the Bankruptcy Act means that the sums which Embassy contracted to pay to these employees for their labor by making payments to welfare funds are wages due to workers. If the provision granting priority to wages is to be narrowed, it should be done by Congress—not by this Court.

I would affirm.