Matter of **EINHORN BROS., INC.,**
**Bankrupt.**

**Textile Banking Company, Inc.,**
**Appellant.**

**No. 12922.**

United States Court of Appeals
Third Circuit.

Argued Oct. 20, 1959.

Decided Dec. 1, 1959.

John Miles Keefe, New York City (Bennett & Bricklin, Philadelphia, Pa., on the brief), for appellant.

David Rosen, Philadelphia, Pa. (Leon S. Forman, Wexler, Mulder & Weisman, Goff & Rubin, Philadelphia, Pa., on the brief), for Trustee in Bankruptcy.

Isadore Gottlieb, Philadelphia, Pa., for Dickinson Realty Corporation.

John F. Finney, Philadelphia, Pa. (Morley W. Baker, Asst. Atty. Gen., Anne X. Alpern, Atty. Gen., on the brief), for the Commonwealth.

Before GOODRICH and KALODNER, Circuit Judges, and WOOD, District Judge.

WOOD, District Judge.

## I. Statement of the Case

This is an appeal by a secured creditor, The Textile Banking Company, Inc., (hereafter called "Bank") from an Order of the District Court affirming the Order of Distribution of the assets of Einhorn Bros., Inc.

The facts of the case are not in dispute. Sometime prior to January, 1957, Einhorn Bros., Inc., had borrowed money from the appellant Bank. As security for the loan, Einhorn entered into an Inventory Loan Agreement granting the Bank a security interest upon all of Einhorn's merchandise inventory. Following the filing provisions of the Uniform Commercial Code,[1] the Bank perfected its security interest, e. g., obtained a valid lien, upon the inventory in January, 1957.

Thereafter, the Commonwealth of Pennsylvania filed claims against Einhorn for non-payment of sums due under the Unemployment Compensation Law,[2] and thereby obtained liens upon all real and personal property of Einhorn.[3]

On June 4, 1957, the Dickinson Realty Company took an assignment of the lease under which Einhorn was operating its business. An installment of rent became due on November 1, 1957, but was not paid. On November 12, 1957, the Dickinson Realty Company had a warrant of distress for rent due and owing served upon Einhorn. The details of the landlord's distraint are important in this case, and will be fully discussed below.

On November 18, 1957, the Bank attempted to have the merchandise inventory removed from the leased premises by bringing an action of replevin with bond. On that same day, Einhorn filed a Petition for an Arrangement under Chapter XI of the Federal Bankruptcy Act, 11 U.S.C.A. § 701 et seq. The Bankruptcy Court issued an order restraining execution of the Writ of Replevin before the sheriff could have the inventory removed. The Bank took no further action in the replevin action or otherwise to contest the restraining order.

In the months following, Einhorn was unable to meet the terms of the proposed Arrangement, and as a result, an Adjudication of Bankruptcy was entered on January 22, 1958. The Receiver and Trustee finished the manufacture of the merchandise inventory and sold it for $36,025.59. The remaining assets were sold for $9,959.55.

---

1. The Uniform Commercial Code, Art. 9, Sec. 302, Pa.Stat.Ann., Tit. 12A, Sec. 9–302 (Purdon 1954), provides inter alia: "(1) A financing statement must be filed to perfect all security interests * * *" Sec. 9–303 Id. provides: " * * * a security is perfected (a) if filing is required under Section 9–302(1), at the time of filing * * *".

2. Pa.Stat.Ann., Tit. 43, Sec. 751 et seq. (Purdon 1952).

3. Sec. 788.1, Id. provides, inter alia: "All contributions * * * due and payable by an employer under the provisions of this act shall be a lien upon the franchises and property, both real and personal, of the employer liable therefor, from the date a lien for such contributions * * * is entered of record in the manner hereinafter provided * * *".

II. The Distribution in Bankruptcy

The general scheme of distribution of a Bankrupt's assets under the Federal Bankruptcy Act is shown below. The claims shown are the claims against the Trustee in the case at bar.

I. *Secured Creditors*

*Claims*

A. Bank's lien on merchandise inventory, covering amount of loans plus interest    $38,026.33

These liens are *postponed in payment* until claims for costs of administration and claims for wages have been paid in full. See Sec. 67, sub. c(1) of the Federal Bankruptcy Act.[4]

    B. Commonwealth's liens on all property of Bankrupt, covering sums due under Unemployment Compensation Law    5,368.81

    C. Landlord's lien on property distrained, covering rent *actually* accrued and in arrears for a period not exceeding 3 months *prior* to bankruptcy    1,054.11

    D. Other secured claims [5]

II. *Unsecured Creditors*

    A. Claims given priority over other unsecured claims by Sec. 64 of the Federal Bankruptcy Act [6]

       1. Claims for costs of administration
         a. Costs of Chapter XI proceedings    $10,441.56
         b. Costs of Administration in Bankruptcy    6,292.12

         16,733.68

       2. Claims for wages due employees of Bankrupt    4,839.73

    B. Other Unsecured Creditors

       1. Claim of the Health Insurance and Retirement Fund of the Philadelphia Dress Joint Board [7]    1,200.00

---

4. Sec. 67, sub. c(1) of the Federal Bankruptcy Act, 66 Stat. 427 (1952), 11 U.S.C.A. 107, sub. c(1), provides: " * * * statutory liens, including liens for taxes or debts owing * * * to any State * * * on personal property * * * and liens, whether statutory or not, of distress for rent shall be *postponed in* payment to the debts specified in clauses (1) and (2) of subdivision (a) of section 104 of this title and such liens for wages or for rent shall be restricted in the amount of their payment to the same extent as provided for wages and rent respectively in subdivision (a) of section 104 of this title * * * ".

5. There were three other secured creditors claiming small amounts not involved in this appeal.

6. Sec. 64, sub. a of the Federal Bankruptcy Act, 70 Stat. 725 (1956), 11 U.S.C.A.

7. See Note 7 on page 438.

■ Referring to the chart, the secured creditors are listed in the order in which their respective liens arose. It must be remembered that the Federal Bankruptcy Act does not provide any rule for deciding questions of superiority among competing liens.[8] State law governs such questions. The Commonwealth and the landlord in this case contend that their respective liens are superior to the lien of the Bank, even though the Bank's lien arose before the liens of the Commonwealth and before the landlord obtained its lien by distress.

■ Assuming that this contention is correct, the Trustee in Bankruptcy, following Pennsylvania law, would distribute the proceeds of the merchandise inventory first to the Commonwealth and the landlord, and then to the Bank. But

104, sub. a, provides *inter alia:* "The debts to have priority * * * and the order of payment, shall be (1) [costs]; (2) wages and commissions * * *; (3) [costs of opposing an arrangement]; (4) taxes legally due and owing by the bankrupt to the United States or any State * * *; and (5) * * * rent owing to a landlord who is entitled to priority by applicable State law: Provided, however, that such priority for rent to a landlord shall be restricted to the rent which is legally due and owing for actual use and occupancy of the premises affected, and which accrued within three months before the date of bankruptcy."

7. This $1,200.00 was paid into the Registry of the District Court pending the outcome of the case of United States v. Embassy Restaurant, Inc., 1959, 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d 601. This case has now made it clear that a welfare fund claim, such as the claim of the Board in this case, is not entitled to priority of any kind.

8. In order that liens be "competing liens", they must, of course, be liens upon the same property.

9. In the Quaker City case, this Court held that the postponement of a landlord's lien, which was superior under Pennsylvania law to the lien of a chattel mortgage, had the effect of postponing the lien of the chattel mortgage. The order of distribution was as follows: (1) costs, (2) wages, (3) landlord's lien, and (4) lien of chattel mortgage. It may be

the Trustee would also have to consider the effect of Sec. 67, sub. c(1) of the Federal Bankruptcy Act (quoted in footnote 4, supra) which requires the postponement of payment of both the liens of the Commonwealth and the lien of the landlord to the payment in full of costs of administration and wages. The Act does not in terms postpone the payment of the Bank's lien. Nor does the Act dictate what effect is to be given the Bank's lien by the postponement of the two liens superior under State law to the Bank's lien. This Court has already, however, concluded that the effect to be given the Bank's lien by the postponement of the superior liens is postponement of the Bank's lien. In re Quaker City Uniform Co., 3 Cir., 1956, 238 F.2d 155.[9] Following the doctrine of the Quaker City case, the order of distribution in this case would be (1) costs of administration, (2) wages, (3) liens of Commonwealth, (4) lien of landlord, and (5) Bank's lien.[10] That is the order of distribution adopted by the Referee and affirmed by the Court below.[11]

The Bank did not seriously urge this Court to overrule its decision in Quaker City. Instead the Bank has attempted to show that the claims of the Commonwealth and landlord were not valid liens; or, if these claims did amount to valid liens, such liens were not superior to the

noted here that the interpretation of the proper effect of Sec. 67, sub. c(1) made by this Court in the Quaker City case is not the only possible interpretation. Collier on Bankruptcy, Vol. 4, p. 297 et seq., points out the other possible interpretations and indicates the adoption by other Circuits of different interpretations.

10. The question of superiority of liens as between the Commonwealth and the landlord was not raised by any of the parties nor discussed by the Court below. The Referee apparently concluded that the Commonwealth's liens were superior to the landlord's lien, since the Commonwealth was listed ahead of the landlord in the order of distribution.

11. The Bank's claim for $38,026.33 was prorated and the Bank received only $16,-629.08.

lien of the Bank. If the Bank is correct in either of its contentions, then the Bank should have received full satisfaction of its claim out of the proceeds of the sale of the inventory subject to its lien before any other claim was paid.

### III. Validity of the Landlord's Lien

The Bank argues that the landlord did not have a valid lien on the merchandise inventory because a landlord's lien arises only upon goods distrained, and the goods listed in the notice of distress did not include the merchandise inventory.

The requirement that a notice of distress be served upon the tenant is set forth in the Landlord and Tenant Act of 1951, Art. III, Sec. 302, Pa.Stat.Ann., Tit. 68, Sec. 250.302 (Purdon, 1958 Supp.). That section provides that personal property upon the leased premises is subject to distress for rent due, and requires the following notice of distress: "Notice in writing of such distress, stating the cause of such taking, *specifying the date of levy and the personal property distrained sufficiently to inform the tenant or owner what personal property is distrained* and the amount of rent in arrears, shall be given, within five days after making the distress, to the tenant and any other owner known to the landlord * * *". (Emphasis supplied.)

Whenever goods upon which there is a distress for rent are sold by a receiver or trustee in bankruptcy the landlord acquires a lien on the proceeds of the sale of such goods.[12] Therefore, the landlord in this case had a lien upon the fund created by the sale of only those goods upon which there was a distress.

The notice of distress in this case specified items of office furnishings together with 300 dresses as the property distrained. At the end of this handwritten list of items is printed the phrase "together with all and singular the goods and chattels on the premises sufficient to pay the rent and costs." The notice further specified the rent due and owing as $55,183.62.

The Bank contends that because merchandise inventories were not specifically mentioned in the list of items distrained in the notice, the inventories cannot properly be regarded as part of the goods which were distrained. This argument would merit more consideration if the Bank had acted, or failed to act, in reliance upon the notice, and had been damaged thereby. But the Bank's conduct with respect to the merchandise inventory was never affected by anything in the notice. Furthermore, anyone reading the notice in order to determine what property was subject to the landlord's distress would have been fairly apprised, both from the catch-all phrase printed at the end of the list of the items distrained, and from the amount of rent claimed as due, of the fact that *all* personal property on the premises was included.

We hold that the landlord had the right to distrain all of the personal property on the premises, including the merchandise inventory; that the landlord did restrain all such property; and that the notice of distraint gave adequate warning to anyone interested that all property on the premises was subject to the landlord's distraint.

The next contention of the Bank is that when it caused to issue a Writ of Replevin With Bond, the landlord's rights in the inventory were thereby annulled. The Bank bases this conclusion on a line of Pennsylvania cases [13] which hold that once property, upon which there was a warrant of distress, has been replevied, the landlord must rely on the replevin bond for satisfaction of his claim for rent. Therefore, argues the Bank, the landlord in this case lost its lien upon the inventories when the Writ of Replevin was issued.

12. Pa.Stat.Ann., Tit. 68, Sec. 322 (Purdon 1931), as amended 1931, June 22, P.L. 889, Sec. 1, Pa.Stat.Ann., Tit. 68, Sec. 322 (Purdon, 1958 Supp.).

13. Blum v. Monocchia, 1939, 87 Pittsb.Leg. J. 335, 53 York Leg.Rec. 86; Auto Finance Co. v. Garber, 1926, 13 Erie 188.

But the landlord was never able to look to the replevin bond for satisfaction of its claim for rent. A replevin bond is designed to protect a party interested in the property replevied against any loss which might be caused by the conduct of the party who has gained possession of this property, pending the outcome of the action of replevin. The Bank here never gained possession of the inventory, and so there was no need to protect the landlord's interest in the inventory by way of a replevin bond. The landlord, therefore, did not lose its lien on the inventory when the Bank instituted the action of replevin.

The last argument made by the Bank to show that the landlord did not have a valid lien is based entirely on the case of In re Mount Holly Paper Co., 3 Cir., 1940, 110 F.2d 220.[14] The Mount Holly case[15] is easily distinguishable from the case at bar because it was decided under sections of the Federal Bankruptcy Act which are no longer in force.[16]

In conclusion, we hold that the Dickinson Realty Company, landlord, had a lien for $1,054.11 on the proceeds of the sale of all the assets of the Bankrupt, including the merchandise inventory, which lien was neither annulled by the issuance of the Writ of Replevin nor forfeited by the landlord's distraint.

### IV. The Superiority of the Landlord's Lien

The final argument of the Bank against the landlord is that the Bank's lien was superior to the landlord's lien.

It is true that even though the landlord had a valid lien on the proceeds of the sale of the merchandise inventory, the Bank's lien should not have been postponed in payment (under Sec. 67, sub. c(1) of the Federal Bankruptcy Act; see footnote 4, supra) unless the landlord's lien was superior to the Bank's lien under Pennsylvania law. As the Court below points out, before the Uniform Commercial Code, a landlord's lien was given superiority over other liens by Pennsylvania statute[17] and case-law.[18] The Uniform Commercial Code does not

---

14. The facts in that case were as follows: The Bankrupt defaulted in payment of $250.00 of rent and $650.00 of property taxes due under the lease. The lease contained an acceleration clause providing that upon default by the lessee future rent would mature and become due. The landlord, considering the future rent as due, distrained for the $900.00 past due and for $3,000.00, one year's rent in advance. The Special Master awarded the landlord the $900.00 only. The landlord objected to the Master's refusal to award him the $3000.00 for future rent due and to the Master's subordination of his claim to claims for wages. The District Court affirmed the Master's report. The Circuit Court affirmed on the grounds that the landlord had "forfeited its lien" by its "bad faith attempt" to gain a lien for more rent than was actually due and owing.

15. The Court found that the landlord showed "bad faith" in distraining for more rent than was actually due. The applicable law of Pennsylvania allowed the landlord to obtain a lien (by distress) for one year's rent past or for accelerated future rent. The Federal Bankruptcy Act did not then (as it does now) restrict the amount of the landlord's lien.

16. The Mount Holly case was decided under the provisions of the Act of 1898. Under that Act, in order for a lien to be valid against the trustee in bankruptcy, the lien had to be "given or accepted in good faith" (Sec. 67, sub. d of the Act). Furthermore, as pointed out in footnote 15, supra, if a landlord had acquired a valid lien under state law securing one year's rent, the Bankruptcy Act recognized that lien without limitation as to the amount of rent it could secure. Under the present Act, a lien is limited to the amount of rent owing for three months of actual occupancy (Sec. 67, sub. c(1) and Sec. 64 of the present Act). Therefore, today, no matter how much rent a landlord claims in his notice of distress, he cannot possibly obtain a lien for more than the amount of rent due for three months actual occupancy. Therefore, the bad-faith-argument adopted by the Court in the Mount Holly case has no application under the law as it is today.

17. Pa.Stat.Ann., Tit. 68 Sec. 322 (Purdon, 1958 Supp.).

18. In re Quaker City Uniform Co., supra, 238 F.2d at page 157; Reinhart v. Gerhardt, 1943, 152 Pa.Super. 229, 31 A.2d

apply to a landlord's lien,[19] and, therefore, we conclude, does not change existing Pennsylvania law.

The Bank offered one final argument against the superiority of the landlord's lien which was adequately answered by the Court below.[20] The Referee, then, correctly applied the doctrine of the Quaker City case (footnote 9, supra) in postponing payment of the Bank's lien until costs of administration, claims for wages, and the landlord's lien were paid in full.

## V. The Superiority of the Liens of the Commonwealth

Applicable Pennsylvania statutes clearly indicate the superiority of the Commonwealth's liens for sums due under the Unemployment Compensation Law over any other liens on the same property.[21] In order to overcome the clear statutory directives, the Bank relies first on the case of Commonwealth, etc., v. Lombardo.[22] The Bank points out the following language in that opinion:

737; Herman v. Osgood, Pa.C.P.1955, 103 Pittsb.Leg.J. 231.

19. Pa.Stat.Ann., Tit. 12A Sec. 9-104(b) (Purdon, 1954).

20. "Finally, Textile resorts to a plea that the doctrine of marshaling be invoked. This is the doctrine whereby one claiming a lien against two or more classes of property, one of which is also subject to a junior lien, will be required to exact satisfaction from the property not subject to the junior lien. Thus, the junior lien is preserved where other assets exist sufficient to satisfy the senior lien. See Collier, op. cit. supra, par. 67.27, at 300. Textile's reliance upon the doctrine in the instant case is misplaced. Although the landlord's lien attached to property on the bankrupt's premises other than that subject to Textile's security interest, by virtue of § 67, sub. c(1), 11 U.S.C.A. § 107, sub. c(1), the lien is subordinated to both wages and costs of administration. These latter claims are more than sufficient to exhaust all other assets of the estate, thus compelling the landlord to resort to the fund claimed by Textile. In this situation, the possibility of marshaling is obviously excluded." Matter of Einhorn Bros., Inc., D.C.E.D. Pa.1959, 171 F.Supp. 655, 660.

21. "Contributions to be Liens; entry thereof
"All contributions * * * due and payable by an employer * * * shall be a lien upon the franchises and property, both real and personal, of the employer * * * from the date a lien for such contributions * * * is entered of record in the manner hereinafter provided. Whenever the franchises or property of an employer is sold at a judicial sale, all contributions * * * thus entered of record shall *first* be allowed and paid out of the proceeds of such sale in the same manner * * * that State taxes

are paid." Pa.Stat.Ann., Tit. 43 Sec. 788.1 (Purdon 1952). The Fiscal Code provides: "All State taxes * * * shall be a first lien * * * from the date of settlement, assessment or determination and whenever the * * * property * * * shall be sold at a judicial sale, all taxes * * * to the Commonwealth shall first be allowed and paid out of the proceeds * * * before any judgment, mortgage, or any other claim or lien * * *" Pa.Stat.Ann., Tit. 72 Sec. 1401 (Purdon 1958 Supp.).

22. 1947, 356 Pa. 597, 52 A.2d 657. The facts in that case were as follows: One Patsy Lombardo owed the Commonwealth sums due under the Unemployment Compensation Act. The Commonwealth recorded the debt and thereby obtained a lien upon the debtor's property. The Commonwealth reduced the lien to a judgment in 1943. In 1946 the debtor transferred his automobile to one Rose Lombardo. A few months later, the Commonwealth issued a writ of fieri facias and the sheriff seized the automobile from Rose Lombardo. Rose Lombardo was concededly a bona fide purchaser for value without actual notice of the lien. The Commonwealth argued that the purchaser had constructive notice of the lien since the lien was recorded. The Court held, however, that Rose Lombardo took the automobile free from the Commonwealth's lien. In the opinion the Court stated: "No such restriction on the alienation of personal property has existed in our law * * *. If we are to read such an intent into the law, [i. e., the Unemployment Compensation Law] it would seem that the language of the act should state clearly and unequivocally its purpose to limit one of the incidents of ownership of personalty, that is, its freedom of alienation by transfer of possession." At page 603, of 356 Pa., at page 659 of 52 A.2d.

" * * * The language of section 308.1 of the Unemployment Compensation Law [Tit. 43 Sec. 788.1 of Purdon's, see footnote 21, supra] is not in our opinion effective to establish a lien against the personal property of an employer so as to prevent its transfer to a bona fide purchaser for value prior to the time that the writ of fieri facias, the first step in the execution process, is placed in the hands of the sheriff." At pages 608, 609 of 356 Pa., at page 662 of 52 A.2d.

From this statement the Bank concludes that the Commonwealth, in the case at bar, never had a valid lien against the merchandise inventories of the Bankrupt, since the Commonwealth never issued a writ of fieri facias.

The simple answer to this contention is found in the same statement from the Lombardo case upon which the Bank relies: The Court says that the language of Sec. 308.1 is not effective to establish a lien against personal property of an employer *"so as to prevent its transfer to a bona fide purchaser for value."* The Bank contends, however, that its lien is entitled to the same protection against the Commonwealth's lien as is accorded a bona fide purchaser for value. But this contention assumes the result for which the Bank argues. The whole point of the Lombardo case is that Sec. 308.1 does not *specifically* state the effect to be given the Commonwealth's lien as against a bona fide purchaser for value. The Pennsylvania Supreme Court itself stated in the opinion:

"The real question here is whether an innocent purchaser of personal property ought to be bound by such notice as is afforded by the filing of the lien. As we have analyzed the

law, under the principles of statutory construction, our answer is no." At page 605 of 356 Pa., at page 661 of 52 A.2d.

But as to the effect of the Commonwealth's lien *as against competing liens*, Sec. 308.1 *specifically* states:

"All contributions * * * thus entered of record shall *first* be allowed and paid out of the proceeds of such sale * * *" (Emphasis supplied.)

The Fiscal Code (72 Purdon Stat. § 1401, 1958 Supp., quoted in footnote 21, supra) specifically provides that at a judicial sale the Commonwealth's lien shall be allowed *before any other claim or lien.* The Lombardo case has no effect on the clear meaning of these statutes as applied to the facts of the case at bar, i. e., as applied to the question of the superiority of the Commonwealth's lien as against the lien of the Bank at a judicial sale, or sale in bankruptcy.

But the Bank contends that the Lombardo case has already been applied by this Court in resolving a question of competing liens. In the case of Ersa Inc. v. Dudley, 3 Cir., 1956, 234 F.2d 178, this Court held that the filing of a lien for unpaid contributions due under the Unemployment Compensation Law does *not* create a perfected lien upon the employer's personal property, and that the lien is perfected only when a writ of fieri facias is delivered to the sheriff. Following the statement in the Lombardo case (to the effect that the lien is not established until the sheriff has the writ of fieri facias), the Court held that as between a prior recorded lien of the Commonwealth and a lien of the United States, the lien of the United States prevailed, although arising (in point of time) *after* the Commonwealth's liens were recorded.[23]

23. In the Ersa case, one Manos owed $223.56 to the Commonwealth for sums

due under the Unemployment Compensation Law. In 1950, the Commonwealth

The Court below distinguished the Ersa case on the ground that it determined the extent to which liens of the Commonwealth (arising under the Unemployment Compensation Law) must be perfected in order to prevail over a subsequent lien of the Federal Government. In addition, we observe another distinguishing feature of the Ersa case, which is that the lien competing with that of the Commonwealth arose subsequent to the recording of the Commonwealth's lien, whereas here the lien competing with that of the Commonwealth arose prior to the recording of the Commonwealth's lien. In the case at bar whether or not the Commonwealth issued a writ of fieri facias could have made no difference to the Bank. This is true since it obtained the lien prior to the time of recording by the Commonwealth.

The Referee and the Court below, therefore, correctly determined that the lien of the Bank was inferior to that of the Commonwealth and as a result, it was entitled to priority of payment over the Bank.

The decision of the Court below is affirmed.[24]

recorded the debt and obtained a first lien on Manos' restaurant equipment. The lien was subsequently reduced to a judgment. *Thereafter* (in 1952) liens for taxes due the United States were recorded. In 1954, the Commonwealth issued a writ of fieri facias on the judgment, and the restaurant equipment was sold for $176.87 to the Commonwealth, which in turn sold it to Ersa for $1,436.-68. The Director of Internal Revenue then posted a notice of levy on the property bought by Ersa, and Ersa brought this action to strike the levy. The District Court, 134 F.Supp. 627, quashed the levy, on the theory that (1) Federal law determines the superiority between liens for taxes due the United States and taxes due a State, and (2) the test of

superiority under Federal law is first-in-time, first-in-right. Therefore, the lien of the Commonwealth, being first in time, prevailed over the lien of the Federal Government. The Circuit Court agreed with the District Court except in one important respect; i. e., the Circuit Court held that the lien of the Commonwealth was *not* prior in time to that of the Federal Government, since the Commonwealth's lien is not "perfected" until issuance of a writ of fieri facias.

24. Subject to the reallocation of the $1,200 claim of the Joint Dress Board from its inclusion under "claim for wages" to form part of the fund prorated and distributed to the secured creditors.