GENIX SUPPLY CO., Appellant, *v.* BOARD OF TRUS–
TEES OF THE HEALTH AND INSURANCE FUND
FOR CARPENTERS LOCAL UNION NO. 971:
ROLAND OAKES, E. W. McKENZIE, MEL HAN–
COCK, GROVE R. HOLCOMB, STANLEY WOOD–
MAN, JOHN MORMAN, BURKE J. MORRISON
and JOHN PRUITT; and BOARD OF TRUSTEES
OF THE PENSION TRUST FUND FOR CARPEN–
TERS LOCAL UNION NO. 971: JOHN O. MOR–
MAN, ROWLAND OAKES, MEL HANCOCK, E.
W. McKENZIE, BURKE MORRISON and JOHN
PRUITT, Respondents.

No. 5421

March 29, 1968　　　　　　　　438 P.2d 816

*Ellis R. Ferguson,* of Reno, for Appellant.

*Lorin D. Parraguirre,* of Reno, for Respondents.

## OPINION

By the Court, Zenoff, J.:

R. W. Porter, Inc., a licensed contractor, was obligated under the terms of a master collective bargaining agreement

to pay certain prescribed contributions to the trustees of the unions' health and insurance and pension plans for the membership. The contractor defaulted in those payments, $3,715.06 in one instance and $7,352.80 in the other. Porter having gone out of business, the trustees filed claims for the defaulted sums against the two $5,000 bonds Porter had deposited with the state when he obtained his contractor's license pursuant to Chapter 624 of the 1963 Nevada Revised Statutes then in effect.[1]

Genix Supply Co. was a supplier owed monies by Porter. In the action of the trustees against the bonding companies, Genix interpleaded and cross-claimed for its unpaid bills and other creditors did the same. In all, their claims apart from the trustees' claims exceeded the face amount of the bonds.

The trial court granted summary judgment for the trustees of the welfare funds on the ground that the contributions of the employer into the funds are entitled to the priority of claims for wages under NRS 624.270(4) which provides that, "The claim of any employee of the contractor for wages shall be a preferred claim against any such bond or cash deposit." The other creditors, through Genix, appeal from that ruling.

We think it clear that the bonds required of contractors by NRS 624.270 are liable to claims for unpaid material and labor bills if the contractor defaults. Royal Indemnity v. Special Service Supply Co., 82 Nev. 148, 413 P.2d 500 (1966), construing a bond identical to those in the instant case. Furthermore, NRS 613.125 imposes a statutory requirement upon the contractor to pay fringe benefit contributions previously agreed upon or suffer the consequences if he does not do so. Failure to pay fringe benefit contributions is either an unlawful act or an omission contemplated by NRS 624.270(3).[2]

---

[1]NRS 624.270(1)(a). "1. No new license, as distinguished from the renewal of an existing license, shall be issued hereafter by the board unless the applicant for a new license shall:

(a) File, or have on file, with the board a bond issued by a qualified surety insurer in a sum to be fixed by the board based upon the magnitude of the operations of the applicant, but which sum shall not be less than $500 nor more than $5,000, running to the State of Nevada and conditioned upon his compliance with all the provisions of this chapter * * *."

[2]NRS 624.270(3). "Every person injured by the unlawful acts or omissions of a contractor who has filed a bond or posted a cash deposit as required under the provisions of this section may bring an action in a proper court on the bond or a claim against the cash deposit for the amount of the damage he suffered as a result thereof to the extent covered by the bond or cash deposit."

Since the claims in this case are properly chargeable against the bonds, the narrowed question is whether the unpaid fringe benefits are entitled to the wage claim priority as "wages" (NRS 624.270(4)), or, because they are paid by the employer to the union trust funds and commingled like insurance premiums, they lose their preferred status. The amount available for distribution hangs in the balance.

The United States Supreme Court in United States v. Embassy Restaurant, 359 U.S. 29 (1959), limited the definition of "wages" to in-pocket monies due the worker. The court stated that welfare fund contributions do not have the customary attributes of wages, that notwithstanding the contention that since "unions bargain for these contributions as though they were wages," and industry likewise considers them "as an integral part of the wage package," nevertheless the contributions to the trust funds do not serve the purpose of a cushion that the bankruptcy act priority intended. (See also In the Matter of A. & S. Electric Corp., 379 F.2d 211 (2nd Cir. 1967).)

In our view, United States v. Embassy Restaurant, supra, is confined to its own function, the determination of relative priorities of classes of creditors in a bankruptcy action before a bankruptcy court. It need not apply to other statutes (United States v. Carter, 353 U.S. 210 (1957), a Miller Act case) or to local problems. True, welfare funds offer no support to the workman against the economic dislocation caused by an employer's bankruptcy, but in a federal bankruptcy all of the assets and liabilities are marshalled. There is no other place the creditors can go. In this case, there may be other avenues of relief available to creditors, for example, a suit against Porter (see NRS 624.270(4)), or participation in bankruptcy proceedings. We need concern ourselves only with the relative placement of two types of claims, one for labor and one for materials and the statute says labor comes first.

Our state has consistently declared a policy of providing balance to the unbalance between labor and business. For their respective purposes we have the office of labor commissioner, workmen's compensation, unemployment legislation, laws regulating hours and wages and others. The preference given in the statute we now are considering is consistent with that policy and we would be inconsistent if we rule that wages are not wages for this purpose. Simply because some of the workman's pay goes into a fund for his sickness and old-age security instead of in a paycheck does not alter the fact that the

fringe benefits are a result of his own efforts the same as the money he puts in his pocket. When the union bargained on his behalf everything obtained was in return for the services he was to render.

Reference is made to the method of computation of the contributions to the trust funds, by monthly flat rates or hourly flat rate. We are not impressed with any special significance of that fact or that the language in the collective bargaining agreements and trust agreements use the word, "contributions," and even specify that contributions are not to be construed as wages. Those documents within themselves are drawn for taxation purposes.

Affirmed.

COLLINS, BATJER, and MOWBRAY, JJ., concur.

THOMPSON, C. J., dissenting:

When the bonds were written our law provided that "the claim of any employee of the contractor for wages shall be a preferred claim against any such bond * * *." 63 Stat. ch. 345, p. 695. The narrow issue presented is whether a contractor's required contributions to the trustees of the union's health, insurance and pension fund are "wages" within the statutory contemplation entitling the trustees to a preferred position in pressing claims against the bonds.

The only court opinion possessing relevance to the issue is United States v. Embassy Restaurant, 359 U.S. 29 (1959). In a split decision the United States Supreme Court ruled that such contributions were not entitled to priority in payment under the Bankruptcy Act as "wages . . . due to workmen." Persuasive arguments on either side of the question are readily apparent, and are presented by the opposing opinions in Embassy.

I doubt that the legislature intended anything other than in-pocket monies due the worker when it wrote the priority statute. An assumed case will serve to point up the precise issue. Suppose that conflicting claims against the bond were to be pressed by laborers for "wages" on the one hand, and by trustees for "contributions" to the welfare fund, on the other. In such event, I would grant the laborers a preferred position on the ground that "wages" as used in the statute means in-pocket monies due the workers, and not the fringe benefits contracted for. This, because I think the legislative purpose was to prefer the laborers' present right to compensation for work performed over their right to contingent benefits

to later accrue. The statute should not receive a different construction simply because the issue is presented in a different context. For this reason I reject the notion that wages and welfare contributions are the same thing.

Respectfully, I dissent.