### W. W. CROSS & CO., Inc. v. NATIONAL LABOR RELATIONS BOARD (UNITED STEELWORKERS OF AMERICA, C.I.O., et al., Intervenors).

### UNITED STEELWORKERS OF AMERICA, C.I.O., et al. v. NATIONAL LABOR RELATIONS BOARD.

#### Nos. 4364, 4397.

United States Court of Appeals
First Circuit.

May 24, 1949.

---

Edward O. Proctor, Boston, Mass., for W. W. Cross & Company, Inc.

A. Norman Somers, Assistant General Counsel, Washington, D. C. (David P. Findling, Associate General Counsel, and Marcel Mallet-Prevost and Mozart G. Ratner, all of Washington, D. C., on brief), for National Labor Relations Board.

Thomas E. Harris, Washington, D. C. (Arthur J. Goldberg and Frank Donner, both of Washington, D. C., and Grant & Angoff, Boston, Mass., on brief), for United Steelworkers of America, C.I.O., et al.

Before MAGRUDER, Chief Judge, WOODBURY, Circuit Judge, and FORD, District Judge.

WOODBURY, Circuit Judge.

W. W. Cross & Company, Inc., hereinafter referred to as the Company, is a Maine corporation engaged in the business of manufacturing cut tacks and cut nails in the town of Jaffrey, New Hampshire. By concession its activities are such as to render it engaged in "commerce" as defined in § 2(6) of the National. Labor Relations Act, as amended by the Labor Management Relations Act, 49 Stat. 449, 61 Stat. 136, 29 U.S.C.A. § 152(6). For convenience we shall hereinafter refer to the original Act as now amended simply as the Act.

United Steelworkers of America, C.I.O. is a "labor organization", as defined in § 2(5) of the Act, admitting employees of the Company to membership, which organization, since February 17, 1945, has been the duly constituted exclusive bargaining representative of an appropriate bargaining unit of the Company's production employees.

Acting upon a charge filed by the Union against the Company on January 16, 1946, the National Labor Relations Board, after usual proceedings under § 10 of the Act, 29 U.S.C.A. § 160, entered an order on June 17, 1948, directing the Company in the negative to cease and desist from refusing to bargain collectively with the Union with respect to a group health and accident insurance program which the Company had unilaterally initiated, and, in the affirmative, directing the Company, upon request of the Union, to bargain collectively with it as the exclusive representative of an appropriate employee unit as to that program. But, the National Labor Relations Act having been amended in the meantime by the Labor Management Relations Act, which became effective on August 22, 1947, the Board conditioned both the negative and the affirmative parts of its order upon compliance by the Union within thirty days with the requirements of § 9(f) (g) and (h) of the Act, 29 U.S.C.A. § 159 (f–h).

The Union complied with the requirements of § 9(f) and (g) of the Act within thirty days of the date of the Board's order and the Board amended its order accordingly, and thereupon both the Company and the Union as persons aggrieved filed petitions in this court under § 10(f) of the Act to review the order of the Board; the Union contending that the order should be modified by striking out the condition therein requiring compliance by it with the provisions of 9(h) of the Act, and the Company contending that the order should be set aside on the ground that group health and accident insurance is not a matter as to which it could be compelled under the Act to bargain collectively with its employees.[1]

---

[1] The Union as intervenor in the Company's petition supports the Board's position as to the Company's duty under the Act to bargain collectively with its employees with respect to group insurance.

■ The constitutional validity of what has come to be known as the anti-communist affidavit provision imported into the National Labor Relations Act by the Labor Management Relations Act (§ 9(h) of the Act) was carefully considered by the District Court of the United States for the District of Columbia in National Maritime Union of America v. Herzog, 78 F.Supp. 146; was considered again by the District Court of the United States for the Southern District of New York in American Communications Ass'n, C.I.O., et al. v. Douds, 79 F.Supp. 563, probable jurisdiction noted November 8, 1948, both statutory three-judge courts, and was fully considered once more by the United States Court of Appeals for the Seventh Circuit in United Steel Workers of America, C.I. O., et al. v. N.L.R.B., 170 F.2d 247, now pending in the Supreme Court on certiorari. 335 U.S. 910, 69 S.Ct. 480. And in all of these cases, although one judge dissented in each, it was held that the requirements of § 9(h) were constitutional. We are satisfied that this holding is correct and, in view of the extended discussion of the matter in the cases cited, we see no occasion to canvass the question again. An order will therefore be entered denying the Union's petition for review.

■ At first glance, it might be suggested that this conclusion renders the question presented by the Company's petition moot, for the Union not having complied with the condition upon which the Board's order was granted within the time allowed for compliance, there is now no order of the Board against the Company outstanding requiring it to bargain with the Union as to a group insurance program or anything else. But if the Supreme Court in the United Steel Workers and American Communications Ass'n cases now pending before it holds the anti-communist affidavit provisions of § 9(h) of the Act unconstitutional and invalid, the Board's order will stand as an unconditional one and hence one that will support a petition to this court for enforcement. And, if the Supreme Court in the above case holds the requirement of § 9(h) valid, the Board can, and we suppose would, extend the time for filing affidavits by the Union to give it a reasonable opportunity to comply with the condition which, if done, would also render the order enforceable here unless for some other reason the order should prove to be invalid. Under these circumstances it does not seem to us that the question presented by the Company's petition can properly be said to be moot. We shall therefore proceed to consider it.

Section 8(a) (5) of the Act, 29 U.S.C.A. § 158(a) (5), makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a)", and § 9(a) of the Act provides that the duly designated or selected representatives of an appropriate employee unit "shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to *rates of pay, wages, hours of employment, or other conditions of employment."* [Italics supplied.] The question then is whether a group health and accident insurance program is a subject matter included within the meaning of the words of the statute which we have italicized.

The Company contends that it is not. Its argument, as briefly summarized in its brief, is this:

"The statute defined the subjects of collective bargaining; these were intended to cover basic conditions of employment which at that time were commonly the subject of collective bargaining, but not welfare activities, such as health and accident insurance, which were not; the background and legislative history of the statute show this to have been the intention of Congress, and the language of the statute is consistent with it. Absence of welfare activities, such as insurance, from collective bargaining as practised up to 1935 when the statute was enacted, is evidenced by quotations from recognized authorities."

■ This argument was elaborately considered, and we think satisfactorily exploded, by the United States Court of Appeals for the Seventh Circuit in Inland Steel Co. v. N.L.R.B., 170 F.2d 247, cer-

tiorari denied April 25, 1949,[2] wherein it was held that a pension plan was an appropriate subject for collective bargaining. We are content to rest on the reasoning of the opinion in the above case so far as refutation of the Company's argument is concerned. That is to say, we think in view of the general purpose and policy of the Act that Congress did not intend to restrict the duty to bargain collectively only to those subjects which up to 1935 had been commonly bargained about in negotiations between employers and employees. On the contrary we think that Congress intended to impose upon employers a duty to bargain collectively with their employees' representatives with respect to any matter which might in the future emerge as a bone of contention between them, provided, of course, it should be a matter "in respect to rates of pay, wages, hours of employment, or other conditions of employment."

The question then comes down to whether a group insurance program is a matter having to do with "wages" or "other conditions of employment", for it obviously has nothing to do with "hours of employment", and if it has to do with "rates of pay" at all (the amount of an employee's contribution to the Company's program depended upon the amount of the employee's weekly pay) its connection therewith is tenuous at best. Indeed we narrow the question still further, for believing a group insurance program to fall within the scope of the word "wages" as used in the Act, we see no need to consider, and therefore explicitly pass, the question whether such a program could also be included within the scope of the phrase "other conditions of employment."

█ The word "wages", following the phrase "rates of pay" in the Act must have been intended to comprehend more than the amount of remuneration per unit of time worked or per unit of work produced. We think it must have been meant to comprehend emoluments resulting from employment in addition to or supplementary

to actual "rates of pay". This does not necessarily mean that the word "wages" as used in the Act covers all satisfactions, pleasures or gratifications arising from employment such as playing on a company baseball team, or attending a company picnic, or belonging to a company social club, although perhaps under some peculiar circumstances of employment in an isolated plant it might. Nor does our construction of the word "wages" necessarily mean that we construe it as covering "real wages" in all the breadth with which some economists use that phrase.

At least, without attempting to mark the outer boundaries of the meaning of the word "wages" as used in the Act, or attempting to enunciate a generalizing principle for the decision of future cases, (generalization must await the accumulation of a body of decided cases pricking out the line between subject matters within the Act and subject matters outside its scope) we think it can safely be said that the word "wages" in § 9(a) of the Act embraces within its meaning direct and immediate economic benefits flowing from the employment relationship. And this is as far as we need to go, for so construed the word covers a group insurance program for the reason that such a program provides a financial cushion in the event of illness or injury arising outside the scope of employment at less cost than such a cushion could be obtained through contracts of insurance negotiated individually. Thus it seems to us that the Company's petition for review should also be denied and the order of the Board enforced as prayed for in its answers to the instant petitions.

A decree will therefore be entered denying both the Union's and the Company's petitions for review, and affirming and enforcing the order of the Board, but, in view of the litigation now pending in the Supreme Court, certification and issuance of the decree to the National Labor Relations Board will be stayed until further order of the court.

[2] This case was decided with United Steel Workers of America, C.I.O., et al. v. N. L. R. B., supra, in which certiorari was granted on January 17, 1949.