PITTSBURGH PLATE GLASS COMPA-
NY, CHEMICAL DIVISION, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent, Local Union No.
1, Allied Chemical and Alkali Workers
of America, Intervenor.

No. 19875.

United States Court of Appeals,
Sixth Circuit.

June 10, 1970.

Guy Farmer, Washington, D. C., for petitioner; John A. McGuinn, Patterson, Belknap, Farmer & Shibley, Washington, D. C., Nicholas R. Criss, Jr., Hugh M. Finneran, PPG Industries, Inc., Pittsburgh, Pa., on the brief.

Nancy M. Sherman, National Labor Relations Board, Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Hans J. Lehmann, Atty., National Labor Relations Board, Washington, D. C., on the brief.

Mortimer Riemer, Cleveland, Ohio, for intervenor, Local Union No. 1 Allied Chemical & Alkali Workers of America; Lawrence M. Oberdank, Cleveland, Ohio, on the brief.

Elliot Bredhoff, Michael H. Gottesman, George H. Cohen, Washington, D. C., for United Steelworkers of America, AFL-CIO, amicus curiae; Bernard Kleiman, Chicago, Ill., of counsel.

Stephen I. Schlossberg, Detroit, Mich., George Kaufmann, Washington, D. C., for International Union, UAW; amicus curiae.

I. J. Gromfine, Herman Sternstein, Zimring, Gromfine & Sternstein, Washington, D. C., for Amalgamated Transit Union, AFL-CIO, amicus curiae.

Lambert H. Miller, Sr. Vice President and Gen. Counsel, Fred B. Haught, Asst. Counsel, Richard D. Godown, Asst. Counsel, Washington, D. C., for National Association of Manufacturers of the United States of America, amicus curiae.

Anthony J. Obadal, Labor Relations Counsel, Chamber of Commerce of the United States of America, Washington, D. C., for Chamber of Commerce of the United States of America, amicus curiae.

William C. Treanor, John W. Whittlesey, New York City, for Union Carbide Corp., amicus curiae.

Before WEICK, CELEBREZZE, and BROOKS, Circuit Judges.

CELEBREZZE, Circuit Judge.

This cause is before the Court on the petition of the Pittsburgh Plate Glass Company, Chemical Division, [hereinafter "the Company"] to review, and upon the National Labor Relations Board's cross-application to enforce a Labor Board order [1] requiring the Company to cease and desist from refusing to bargain collectively with the Union about changing health insurance benefits for previously retired employees, who prior to their retirement, had been actively working for the Company in the collective bargaining unit represented by the Union, and who, upon their retirement, became covered by a Union-negotiated retirement benefit plan. The Board found that by proposing improvements in their retirement health plans to retirees individually, rather than bargaining such alterations collectively with the Union, the Company "unilaterally modified" the retirement benefits in violation of Section 8(a) (5) and (1) of the Labor Management Relations Act, 1947, as amended, 29 U.S.C. § 158(a) (5) & (1) (1964). Local Union No. 1, Allied Chemcial and Alkali Workers of America ["the Union"], which filed the charges initiating these proceedings, has intervened herein, and several other interested parties have filed briefs amici curiae. [2]

This Court has jurisdiction under Section 10(e) and (f) of the Act.

The facts, which are essentially undisputed, raise a question of first impression, so far as we are able to determine, before this or any other Court under the National Labor Relations Act, as amended.

I.

Since 1949, the Union has been the exclusive bargaining representative for Company employees in a unit composed of:

"All employees of the Employer's plant and limestone mine at Barberton, Ohio working on hourly rates, including group leaders who work on hourly rates of pay, but excluding salaried employees and supervisors within the meaning of the Act."

In 1950, the Union and the Company negotiated provisions for an employee group health insurance plan. An oral agreement was made that retired employees could also participate in the plan by paying a stipulated premium, which would be deducted from their pension benefits. The Company made no contribution toward retired employees' health insurance premiums under this program. Except for an improvement unilaterally instituted by the Company in 1954, and another improvement negotiated in 1959, this program remained unchanged in all relevant respects until 1962.

In 1962, the parties entered into a memorandum agreement by which the Company agreed to contribute $2.00 per month toward the cost of the monthly premium for medical benefits, but only for persons who retired from the Company's employ after June 27, 1962. Persons already retired prior to that date received no such contribution. In these

1. The Board's Decision and Order are reported at 177 NLRB No. 114 (1969).

2. Briefs urging enforcement of the Board's order were filed by the American Federation of Labor and Congress of Industrial Organizations; the Amalgamated Transit Union, AFL-CIO; the International Union, UAW; and the United Steelworkers of America, AFL-CIO. Briefs urging that the Board's order be set aside were filed by the Union Carbide Corporation; the National Association of Manufacturers of the United States of America; and the Chamber of Commerce of the United States of America.

negotiations the parties also agreed to make age 65 the mandatory retirement age.

During negotiations for a new labor contract in 1964, the parties again bargained about insurance benefits for retired employees. The Company agreed to increase its contribution to medical benefits for persons retired after June 27, 1962 from $2.00 per month to $4.00 per month. However, anticipating the enactment of Medicare legislation, the agreement provided that if a government health program were enacted, the Company could reduce its contribution by the amount of the 1964 increase, *i.e.*, $2.00 per month.

On November 23, 1965, following the enactment of Medicare and during the term of their outstanding collective bargaining agreement, the Union asked the Company to engage in mid-term bargaining for the purpose of re-negotiating insurance benefits for retired employees of a type not available under Medicare. The Company took the Union's request under advisement and responded at a meeting held on March 21, 1966. First, the Company announced its intention to reclaim its contribution of the extra $2.00 per month beginning July 1, 1966, the effective date of Medicare. The Company's right to do this under the 1964 contract is not in dispute. Second, the Company said it intended to cancel the negotiated health insurance plan for retired employees because, in its opinion, the enactment of Medicare made this insurance useless, and to substitute there-

for a $3.00 monthly contribution for supplemental Medicare benefits for each employee who retired after July 27, 1962. Third, the Company rejected the Union's request to bargain for a supplemental insurance plan, and challenged the Union's right to bargain for retired employees at all.

The Union conceded the Company's contract right to reduce its contribution, but challenged the Company's right to unilaterally substitute supplemental Medicare for the negotiated health program.

Two days later, on March 23, 1966, the Company told the Union that, having reconsidered its position the Company would not unilaterally substitute Medicare for the negotiated health insurance. Instead, the Company said it intended to mail letters to retired employees announcing that they could choose to withdraw individually from the negotiated health insurance plan and, in lieu thereof, the Company would contribute $3.00 per month towards supplemental Medicare premiums.

The Union objected to this proposed action, asserting the right to bargain about any change in the contract affecting the health insurance plan. Nevertheless, the Company refused to bargain with the Union, and on March 24, 1966, mailed the aforementioned letters to retired employees with the result that 15 out of 190 retirees elected the $3.00 contribution to Medicare instead of the negotiated $2.00 contribution to the private health insurance program.[3] In response

---

3. That letter, which forms the basis of this controversy, provided:

Dear Pensioner:

The matter of your Hospital-Medical Insurance is of the utmost importance to you; therefore, we recommend that you read this letter carefully.

The program of Hospital and Medical benefits under the Federal Social Security Act, known as Medicare will become effective on July 1, 1966. Any person who has attained age 65, whether they ever worked and were covered by Social Security or not will be eligible to receive benefits under this program.

*Hospital Benefits* under Medicare will be received automatically by any person 65 years of age or over; no enrollment or payment of premiums is required. However, *Medical Benefits* are voluntary and do require enrollment and the payment of a premium of $3.00 a month per person. Enrollment for Medical Benefits must be completed by March 31, 1966, otherwise enrollment will be delayed to a future date and benefits will be lost.

You are urged to enroll for the Medical benefits available to you as soon as you become eligible since at present you

to the Company's action, the Union filed the instant charges.

The Board's Trial Examiner conducted hearings into the complaint, found the foregoing to be the facts, and concluded that pensioners and retirees are not employees as defined by Section 2(3) of the Act, are not employees within the meaning of Section 8(a) (5), and are not within the bargaining unit; that a Company has no statutory duty to re-negotiate benefits for previously retired employees; that the letter from the Company to the retirees did not constitute a "unilateral change" of any provisions of the negotiated contract or a mid-term change within the intendment of section 8(d). He did not find that the Company's action had the purpose or effect of undermining employees' section 7 rights. Finding

are under 65 years of age. If you have any questions concerning the program, contact your nearest Social Security office when appropriate to do so.

As a pensioner who at present is under age 65, you have been enrolled in a program of Hospitalization-Medical Insurance, as furnished by the Equitable Life Assurance Society, your participation in this program of Insurance for either single coverage or for coverage for you and your spouse has been a voluntary election on your part, and enrollment has been conditioned on your timely payment of the full monthly premium for the type coverage you elected to carry.

It is necessary to inform you at this time, that in your case, the program of Insurance provides that the current Company monthly contribution of $4.00 will be reduced to a $2.00 monthly contribution when Social Security Hospital-Medical benefits program goes into effect in July 1966. This is in accordance with prior arrangements on this matter. However, this reduction will not take place until the month following the month in which you become age 65 or are eligible for Social Security Hospital-Medical benefits.

Should you elect to continue your present coverage *after you become age 65* and are eligible for the Social Security Hospital-Medical Program, the same benefits as outlined in the Certificate of Insurance will continue. We must remind you, however, in considering continuance of your present program of Hospitalization and Medical Insurance that, with respect to this plan there will be no duplication of benefits that are also paid for under the Medicare program.

The Company would like also to inform you that upon your reaching age 65, should you elect to voluntarily discontinue your enrollment in the present Hospitalization Medical program of insurance then your monthly premiums would no longer be deducted from your pension check, and the full amount will be available to you following your withdrawal from the plan.

In the event you do elect to discontinue your present enrollment, after you reach age 65, the Company will then make a contribution of three dollars ($3.00) per month to you, which amount would cover the current individual cost to you for your Social Security enrollment.

If after you reach age 65 and elect *to discontinue your present enrollment*, but your spouse is under age 65, and not yet eligible for the Social Security Hospital-Medical program you may elect to continue her in the present program of Insurance as currently furnished by the Equitable Life Assurance Society, until she reaches age 65 or becomes eligible for the Social Security Hospital-Medical Program. In order to enroll her in this manner you must notify the Company and timely pay the full cost of the premium for single coverage for your spouse. The initial cost of this coverage will be $5.71 per month effective July 1, 1966.

If you have any questions concerning this matter, you may contact Mr. Frank Ruehling in the Insurance Department at the Barberton Plant.

Yours very truly,
W. R. Harris
W. R. Harris

The above-quoted letter was mailed to retirees under age 65 carrying insurance to which the Company made a contribution. Other letters, explaining retirees' rights under Medicare, the negotiated retirement health plans, and the proposed supplemental Medicare contributions, were mailed to: retirees having no insurance coverage; retirees carrying plans of insurance to which the Company made no contribution; retirees carrying insurance to which the Company contributed; and retirees under age 65 carrying insurance to which the Company made no contribution.

violations of neither section 8(a) (5) nor section 8(a) (1), the Examiner recommended dismissal of the complaint.

The Board adopted the Examiner's findings of fact, but disagreed with his construction of the Act. The Board held: that retired employees are "employees" within the meaning of the statute for the purposes of bargaining about changes in their retirement benefits; that, in the alternative, re-negotiating retirement benefits for retirees is within the contemplation of the statute because it "vitally affects active bargaining unit employees"; that the Company had "unilaterally changed" retirees' health benefits in violation of Section 8(a) (1) and (5) of the Act.[4] Accordingly, the Board ordered the Company to cease and desist from refusing to bargain collectively with the Union about adjustments in health insurance plans for retired employees, and otherwise "interfering with, restraining, or coercing employees in the exercise of" their section 7 rights. In addition, the Board ordered the Company to rescind any "unilaterally instituted" adjustment in retirees' health benefits upon request of the Union.

The sole issue in this case is whether an employer may bargain individually with retired employees about alterations in their negotiated retirement benefits, or whether alterations in retirees' retirement benefits are mandatory subjects of bargaining with respect to which an employer must bargain collectively at the request of the Union.

The Labor Management Relations Act enjoins employers to bargain collectively [5] and in good faith with the bargaining agents of their employees [6] about "wages, hours, and other terms and conditions of employment." [7] It is well established, and not in dispute here, that pensions and insurance benefits to be enjoyed by employees after retirement are "wages" for the purposes of the statute, albeit deferred ones, and that insofar as they accompany a provision specifying a mandatory retirement age, as is present in this case, they are also "conditions of employment." W. W. Cross & Company, 77 NLRB 1162 (1948), enf'd, W. W. Cross & Company v. NLRB, 174 F.2d 875 (1st Cir. 1949); Inland Steel Company, 77 NLRB 1 (1948), enf'd, Inland Steel Company v. NLRB, 170 F.2d 247 (7th Cir. 1948), cert. denied on this issue, 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112; National Labor Relations Board v. Black-Clawson Company, 210 F.2d 523 (6th Cir. 1954). Being mandatory, as opposed to permissive, subjects of bargaining, if a company refuses to bargain about active employees' retirement benefits when the employees' bargaining representative requests the opportunity to do so, it violates not only section 8(a) (5), but also section 8(a) (1), which prohibits employers from interfering with, restraining, or coercing

4. Board Member Zagoria dissented from the Board's Decision and Order.

5. Section 8(a) (5), Labor Management Relations Act, 29 U.S.C. § 158(a) (5) (1964) provides:
   "(a) It shall be an unfair labor practice for an employer—
   \*   \*   \*   \*   \*
   (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of Section 9(a)."

6. Section 9(a), Labor Management Relations Act, 29 U.S.C. § 159(a) (1964) provides the statutory method for selection of a bargaining agent:
   "(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employ-ees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment \*   \*   \*."

7. Section 8(d), Labor Management Relations Act, 29 U.S.C. § 158(d) (1964) defines the collective bargaining obligation as:
   "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable time and confer in good faith with respect to wages, hours, and other terms and conditions of employment \*   \*   \*."

942

employees in their section 7 right "to bargain collectively through representatives of their own choosing." [8] Furthermore, being mandatory, the matter can be pressed by either party to an impasse, or be used, under appropriate circumstances, to block an agreement or justify a strike or lockout. *See, e. g.*, National Labor Relations Board v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).

However, the issue in this case is not whether retirement benefits for *active* employees are mandatory subjects of collective bargaining. The issue is once retirements benefits have been negotiated for active employees who have retired and begun collecting benefits, whether an employer may propose improvements in benefits to the retirees individually, or whether retirees are "employees" under section 8(a) (5), changes in whose benefits must be collectively bargained with the union.[9] We find that retirees are not "employees" within the meaning of section 8(a) (5) and that the Company was under no constraint to collectively

8. Section 8(a) (1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in *section 7*." 29 U.S.C. § 158(a) (1) (1964).
Section 7 of the Act, 29 U.S.C. § 157 (1964), provides:
"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *."

9. This is not the case of an employer unilaterally abrogating contractually vested retirement benefits of retirees, as it might have been had the Company unilaterally substituted contributions to supplementary Medicare plans for the negotiated health plans, as it originally planned to do. In that event, the retirees would have had an appropriate remedy, either by invoking the grievance procedure of the contract under which they received the benefits, or by bringing an action under Section 301 of the Labor Management Relations Act, 1947, 29 U.S.C. § 185(a)

bargain improvements in their benefits with the Union.

II.

The Board found that persons who have retired from the service of an employer may be considered "employees" with respect to whom the employer must bargain collectively because, as a general proposition, coverage of the Act is not limited to persons currently in the employ of a particular employer. It is true that for many purposes the Act extends protection to persons not currently serving employers. However, by plain meaning an employer has no statutory duty to bargain collectively with respect to persons who are not "his employees."

Section 2(3) of the Labor Management Relations Act, 1947, 29 U.S.C. § 152(3) (1964), provides:

"When used in this subchapter—
* * * * * *
"(3) The term 'employee' shall include any employee, and shall not be limited to the employees of a particular em-

(1964). *See* United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Even then, however, the Company's conduct would not rise to the level of an unfair labor practice in the absence of a showing of bad faith in arbitration or a reasonable tendency of undermining the union as the bargaining agent for active employees. *See* Sinclair Refining Co. v. NLRB, 306 F.2d 569 (5th Cir. 1962); Independent Petroleum Workers of New Jersey v. Esso Standard Oil Co., 235 F.2d 401 (2d Cir. 1956); National Labor Relations Board v. Pennwoven, Inc., 194 F.2d 521 (3d Cir. 1952).
Nor is this case to be confused with those holding it an unfair labor practice under section 8(a) (5) for an employer to short-circuit the collective bargaining process by bypassing the union and bargaining directly with *active* employees or instituting changes unilaterally during the bargaining process. *See, e. g.*, National Labor Relations Board v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962).
Moreover, we do not decide the extent to which a company violates the Act by making deceptive offers to retirees, the effect of which may be to defraud them into accepting reduced retirement benefits.

ployer, *unless this subchapter explicitly states otherwise*, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment * * * [Emphasis added]."

As the Supreme Court indicated in Phelps Dodge Corporation v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), the purpose of this broad definition, which was borrowed almost wholly from the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115 (1964), was to insure against interpretations, such as had at one time been made under the Clayton Act, that persons not employed by a particular employer were prohibited from peaceful picketing to publicize a dispute because they did not stand in the proximate relationship of employees to the employer involved. *Id.* at 191–192, 61 S.Ct. 845. In addition, it was intended to dispel any notions that labor unions had to limit the extent of their organizations to employees of a single employer. In twice emphasizing the statutory language italicized above, the Supreme Court made plain its belief that the expansive definition of "employee" in section 2(3) was to give way where "the Act explicitly states otherwise." As a particular example, the Court stated:

> "In determining whether an employer has refused to bargain collectively with the representatives of 'his employees' in violation of § 8(5) [now section 8(a) (5)] and § 9(a) it is of course essential to determine who constitute 'his employees.' One aspect of this is covered by § 9(b) which pro-

vides for the determination of the appropriate bargaining unit." Phelps Dodge Corp. v. NLRB, *supra*, at 192, 61 S.Ct. at 851.

There was nothing strained or unnatural in this interpretation. The statute itself plainly provides that it shall be an unfair labor practice for an employer

> "to refuse to bargain collectively with the representatives of *his employees,* subject to the provisions of section 9 (a)."

This construction is, of course, unaffected by those cases on which the Board relies heavily, making it an unfair labor practice under Section 8(a) (3) of the Act for an employer to discriminate in the hiring of applicants for employment, who were not in the company's employ,[10] registrants at hiring halls,[11] employees of a company taken over by a "successor employer," [12] employees who have quit,[13] and other persons not currently employed and outside the bargaining unit. Section 8(a) (3) forbids "discrimination in regard to hire or tenure." If prospective employees or those whose employment has ceased because of illegal discrimination were not regarded as within its terms, a refusal to hire for unlawful reasons, and unlawful discharge, could never be unfair labor practices under this section.

The Board itself has recognized this distinction between the use of the word in section 8(a) (3) and (5):

> "We do not regard as controlling for purposes of determining for whom an employer must bargain those cases cited * * * which hold that the antidiscrimination provisions of Section 8(a) (3), (4) and (b) (2) of the

10. Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845 (1941). *Accord*, NLRB v. Louisville Chair Co., 385 F.2d 922, 925 (6th Cir. 1967), cert. denied, 390 U.S. 1013, 88 S.Ct. 1264, 20 L.Ed.2d 163.

11. Local 872, International Longshoremen's Association, 163 NLRB 586 (1967); Local 1351, Steamship Clerks, etc. v. NLRB, 117 U.S.App.D.C. 304, 329 F.2d 259 (1964), cert. denied, Houston

Maritime Assn. v. NLRB, 377 U.S. 993, 84 S.Ct. 1921, 12 L.Ed.2d 1046.

12. Chemrock Corp., 151 NLRB 1074 (1965). *Chemrock* deals with facts and issues entirely different from those present here, however to the extent of any apparent inconsistency, we decline to follow it.

13. Goodman Lumber Co., 166 NLRB No. 48 (1967).

Act forbid discrimination against applicants for employment. The antidiscrimination provisions refer to 'employees' *generally*, whereas unlike these provisions, Section 8(a) (5) contains specific language requiring an employer to bargain for *'his'* employees. [Emphasis in original]" Page Aircraft Maintenance, Inc., 123 NLRB 159, 163 (1959).

We are similarly unpersuaded by the analogy made by the Board between the word "employee" as that word has been construed for the purposes of Section 302 of the Labor Management Relations Act, 29 U.S.C. § 186 (1964), *see, e. g.*, Blassie v. Kroger, 345 F.2d 58, 68–71 (8th Cir. 1965), and the word "employee" as it appears in section 8(a) (5). Section 302 is a criminal provision, making it a misdemeanor for an employer to make payments to a union representing his employees. Section 302(c), under which *Blassie, supra,* was decided, exempts from the operation of the section employer contributions to, *inter alia*, employee trust funds, among which are pension and retirement plans. Not to regard retirees as employees for the purposes of that section would frustrate the purpose of retirement trusts, which have been designated as mandatory subjects of bargaining, by making distributions to retirees from them illegal. The Board's argument that it is an "anomaly" to treat the word differently under the two sections is itself an anomaly.

We also reject the Board's argument that the interpretation of the word "employee" by the Internal Revenue Service under Sections 401(a) and 501(c) (9) of the Internal Revenue Code of 1954, 26 U.S.C. §§ 401(a) & 501(c) (9) (1964), is dispositive of the issues in this case.

See 26 CFR § 1.401, *as revised,* Jan. 1, 1969.

We find that the general definition of "employees" in section 2(3) is superseded by the explicit statement in section 8(a) (5), and that an employer has a duty to bargain collectively only with the representatives of *his employees.*

■ We now turn to the issue whether retired employees are employees of the Company for the purposes of section 8 (a) (5).[14] Upon this issue the record is clear. Retirement with this Company, as with most other companies, is a complete and final severance of employment. Upon retirement, employees are completely removed from the payroll and seniority lists, and thereafter they perform no services for the employer, are paid no wages, are under no restrictions as to other employment or activities, and have no rights or expectations of re-employment. For these reasons, as will be discussed below, the Board has consistently held that retired employees have no right to vote in representation elections, even when the employer has a right, and they have some expectation, of being recalled to work. W. D. Byron & Sons, 55 NLRB 172, 174–75 (1944).

The fact that retired persons may continue to receive pensions after permanently leaving the service of an employer does not entitle them to continued status as employees. Indeed, the receipt by them of retirement benefits further emphasizes the finality of their employment severance.

We find that persons who have retired from the service of an employer are no longer "his employees."

### III.

■■ In addition to limiting the employer's bargaining obligation to "his

---

14. Although the Board's interpretation of the term "employee" is entitled to some weight, Local No. 207, International Association of Bridge, etc., Workers v. Perko, 373 U.S. 701, 706, 83 S.Ct. 1429, 10 L.Ed.2d 646 (1963) ; National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 130, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), the Board made no finding in this case that retirees are employees within the meaning of the Act. In prior cases, however, the Board has expressly found that retirees are not employees for the purposes of the more expansive section 2(3). *See, e. g.*, Public Service Corporation of New Jersey, 72 NLRB 224, 229–30 (1947).

employees," section 8(a) (5) conditions the bargaining obligation on the provisions of section 9(a), which provides:

"Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for purposes of collective bargaining * * *."

It has repeatedly been held that the scope of the bargaining unit controls the extent of the bargaining obligation, and that a union has no right to demand, over an employer's objection, a change in the unit. *See, e. g.,* Eastern Greyhound Lines v. NLRB, 337 F.2d 84 (6th Cir. 1964); Douds v. International Longshoremen's Association, 241 F.2d 278 (2d Cir. 1957). This second condition, therefore, demands a resolution of the issue whether retirees are in the bargaining unit.

As was indicated above, the unit certified by the Board as appropriate was composed of "employees of the Employer's plant * * * working on hourly rates including group leaders who work on hourly rates of pay * * *." Retirees were not mentioned. Thus, the Board certified a bargaining unit composed only of presumably active employees "of the Employer's plant" and "working on hourly rates of pay."

In no prior case where the issue was raised did the Board hold that a retiree was in such a unit, or entitled to vote in an election. *See* Taunton Supply Corporation, 137 NLRB 221, 223 (1962); Public Service Corporation of New Jersey, 72 NLRB 224, 229–30 (1947); J. S. Young Company, 55 NLRB 1174 (1944); W. D. Byron & Sons, 55 NLRB 172, 174–75 (1944).

In Public Service Corporation of New Jersey, *supra*, 72 NLRB at 229–30, for example, the Board stated:

"We have considerable doubt as to whether or not pensioners are employees within the meaning of Section 2(3) of the Act, since they no longer perform any work for the Employers, and have little expectancy of resuming their former employment. In any event, even if pensioners were to be considered employees, we believe that they lack a substantial community of interest with the employees who are presently in the active service of the Employers."

In W. D. Byron & Sons, *supra*, 55 NLRB at 174–75, the Company had a policy of laying off and pensioning employees who, due to advanced age, could not perform their work well, but the Company retained the right to recall them for light work when it became available. When the pensioners sought to be included in the bargaining unit, the Board stated:

"None of the seven men laid off and pensioned in July 1943 has since been recalled to work, as. no light work has has been available at the tannery in this 6-month period. The Company does not know when suitable work will be available. Since it appears that the pensioners have little expectation of active employment at the tannery, we shall exclude them from the bargaining unit of regular production and maintenance workers."

*See also,* Denver-Colorado Spring-Pueblo Motor Way, 129 NLRB 1184, 1185 (1961), where the Board held that employees are included in proposed units "only if they spend a 'major portion of their time' in tasks alike or similar to the ones of the other employees in the unit." The Board defined "major portion of their time" as 50 percent or more.

Yet, the Board holds in this case that retirees should be included in the bargaining unit for the purpose of renegotiating their retirement benefits because this subject "vitally affects" active bargaining unit employees. The Board indicates that active bargaining unit employees are affected in essentially three ways.

■ First, the Board states that "the Union and current employees have a legitimate interest in assuring that negotiated retirement benefits are in fact paid and administered in accordance with the terms and intent of their contracts." We agree. Congress has provided a remedy, however, for breaches of contracts regarding retirement benefits, and, as we have pointed out below, n. 9, *supra* at p. 12, every breach of a collective bargaining contract is not, per se, an unfair labor practice. In any event, the issue in this case is not whether contract benefits can be legally enforced, but whether contract benefits for retirees must be re-opened at the request of the Union after the employees to whom these benefits are payable have retired.

Second, the Board indicates, and we agree, that active employees have a "selfish" interest about bargaining about retirement benefits, since these benefits are "an integral part of their total compensation." Leaving aside their altruistic sentiments, what active employees are concerned about are *their own* retirement benefits. It is not necessary to extend the bargaining obligation to persons already retired in order to insure current employees the right to negotiate through their bargaining representative their own retirement benefits to take effect after their retirement.

Third, the Board states that changes in retirement benefits for retired persons should be made mandatory subjects of collective bargaining because such changes "affect the availability of employer funds available for active employees." This, again, is of course true. However, does this mean that all employer salaries, including those to supervisory and managerial personnel, are mandatory subjects which must be collectively bargained with the Union? Moreover, all employer expenditures, from dividends to capital expenditures, affect, however obliquely, the availability of employer funds for active unit employees. Surely the Board does not contend that these are mandatory subjects of bargaining.

Congress decreed that the bargaining agent's authority extends only to bargaining for "all of the employees in a unit appropriate for such purposes." The appropriate bargaining unit has economic incidents which the Board simply cannot modify by fiat or enlarge by sympathy.

■ We find that retired employees are not within the bargaining unit, and that under the plain meaning of the Act, employers have no statutory duty to re-negotiate with their unions improvements in retired employees' pension benefits.

IV.

■ Not only are the Board's arguments without support in the language of the Act, they are in defiance of its purpose. The purpose of federal labor legislation is to reconcile and, insofar as possible, equalize the power of competing economic forces within the society in order to encourage the making of voluntary agreements governing labor-management relations and prevent industrial strife. *See* Section 1, National Labor Relations Act, 29 U.S.C. § 151 (1964); Section 1, Labor Management Relations Act, 1947, 29 U.S.C. § 141 (1964); Consolidated Edison Company of New York v. NLRB, 305 U.S. 197, 221–222, 59 S.Ct. 206, 83 L.Ed. 126, 236 (1938); National Labor Relations Board v. American National Insurance Company, 343 U.S. 395, 401–403, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). Its purpose is not artificially to create or manufacture new economic forces. Thus, the Act "leaves the adjustment of industrial relations to the free play of economic forces but seeks to assure that the play of those forces be truly free." Phelps Dodge Corporation v. NLRB, 313 U.S. 177, 183, 61 S.Ct. 845, 85 L.Ed. 1271 (1941).

■ Retired employees have no economic or bargaining power within this system. Their financial security derives

from past economic power pragmatically and prudently exercised. Once retirement benefits have been bargained for, earned, and become payable, the employer may not recant on his contractual obligation to pay them. Section 301, Labor Management Relations Act, 1947, 29 U.S. C. § 185(a) (1964). Nor may retirees demand that they be increased. Changing economic facts pertaining to the employer's business or the general economy occurring after an employee retires cannot enhance or depreciate the value of his prior services or justify periodic post-retirement negotiations. The employer cannot retroactively increase his prices to compensate for these increased benefits, or fund expenses which are, as these would be, open-ended.

Moreover, retirees given the bargaining power would lose their economic security, for just as surely as an employer may increase benefits, in bargaining, he may take them away. Even if retirees were given the statutory power to periodically renegotiate pension benefits previously earned, the union would be an inappropriate bargaining vehicle. It is not at all unlikely that a union negotiator, presented with the opportunity to advance employees' wages at the expense of retirees' pensions, would choose to favor his constituents at the expense of the honorary union members, who retain no voting power.

We have studied with care the evidence in the *amicus curiae* briefs tending to show that the practice in industry is to bargain on retired employees' benefits. This voluntary practice demonstrates the increasingly humanitarian quality of the labor-management relationship, and is to be encouraged. However, it does not form a basis on which this Court can alter the statutory language, or undermine the Congressional intent.

## V.

The Company's petition to review is granted, and the Labor Board's cross-application to enforce is denied.