670 F.2d 208
 216 U.S.App.D.C. 50
 Sonia HILYER (Widow of James H. Hilyer), Petitioner,
v.
MORRISON-KNUDSEN CONSTRUCTION COMPANY and Argonaut Insurance
Company, Respondents.
MORRISON-KNUDSEN CONSTRUCTION COMPANY and Argonaut Insurance
Company, Petitioners,
v.
Sonia HILYER (Widow of James H. Hilyer), Respondent.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION, UNITED STATES
DEPARTMENT OF LABOR, Petitioner,
v.
MORRISON-KNUDSEN CONSTRUCTION COMPANY and Argonaut Insurance
Company, Respondents.
 Nos. 80-1388, 80-1440 and 80-1504.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 19, 1981.
Decided Dec. 1, 1981.
 
 Petitions for Review of Orders of the Benefits Review Board.
 Catherine A. Giacona, Atty., Dept. of Labor, Washington, D. C., for Director, Office of Workers' Compensation Programs, Dept. of Labor, petitioner in No. 80-1504. Joshua T. Gillelan, II, Atty., Dept. of Labor, Washington, D. C., also entered an appearance for Director, Office of Workers' Compensation Programs, Dept. of Labor.
 Richard W. Galiher, Jr., Washington, D. C., for Morrison-Knudsen Const. Co., et al., petitioners in No. 80-1440 and respondents in No. 80-1504.
 George S. Leonard, Washington, D. C., for Sonia Hilyer, cross-respondent in No. 80-1440 and petitioner in No. 80-1388.
 Before ROBINSON, Chief Judge, SWYGERT,* Senior Judge, and ROBB, Circuit Judge.
 Opinion for the Court filed by Senior Circuit Judge SWYGERT.
 SWYGERT, Senior Circuit Judge:
 
 
 1
 In these consolidated appeals we are asked to review a final order of the Benefits Review Board of the United States Department of Labor. The case presents a question of first impression concerning construction of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 et seq. (1976), as extended by the District of Columbia Workmen's Compensation Act, 36 D.C.Code §§ 501, 502 (1973) ("the Act" or "the Longshoremen's Act").
 
 
 2
 The claimant in this case is Sonia Hilyer. On April 19, 1974 her husband, James H. Hilyer, was fatally injured during the course of his employment with respondent Morrison-Knudsen Company.[1] At the time of his death, Hilyer was a member of Local 456 of the Laborers' District Council of Washington, D.C. and Vicinity, an AFL-CIO affiliate. In addition to the covered employees' hourly rates of pay, the collective bargaining agreement between the union and Morrison-Knudsen provided that the company would pay fixed sums of money into three union trust funds. Specifically, the company agreed to pay twenty-eight cents into the health and welfare fund, thirty-five cents into the pension fund, and five cents into the training fund, for each hour that each employee worked.
 
 
 3
 Morrison-Knudsen began paying death benefits under the Act to the claimant immediately upon her husband's death. A dispute arose, however, over the amount of benefits to which she was entitled. Hilyer had been employed by Morrison-Knudsen for only five months when he died. During the year before his death, he had also been employed as a security guard and a grocery clerk, at substantially lower wages. In figuring his average weekly wage, the company took into account his prior employment. The claimant contended that her husband's average weekly wage should be based only on his employment with Morrison-Knudsen. She also contended that the company's contributions to the three union trust funds should be included as part of her husband's "average weekly wage" under the Act.[2]
 
 
 4
 Following a hearing, an administrative law judge agreed with the claimant that the average weekly wage should reflect only the deceased's earnings as a construction worker for Morrison-Knudsen. Accordingly, pursuant to section 10(b) of the Act, the average weekly wage was determined by reference to the average yearly wages of a fellow employee whose wages most closely resembled those of the deceased during the period he worked for Morrison-Knudsen.[3] The administrative law judge further ruled, however, that the contributions to the union trust funds were not includable in the average weekly wage. At the hearing, the claimant also presented a claim for attorney's fees pursuant to section 28 of the Act. Although she requested $7,530, the administrative law judge awarded a fee of $2,988.80.
 
 
 5
 On cross-appeals to the Benefits Review Board, the Board upheld the administrative law judge's ruling with respect to the amount of benefits to which the claimant was entitled. The Board rejected the company's contention that section 10(b) should not be applied, and also rejected the claimants' contention that fringe benefit payments should have been included in the average weekly wage. The Board remanded the case, however, ordering that the administrative law judge give detailed reasons for the substantial reduction of the attorney's fee award. On remand, the case was assigned to a different administrative law judge.[4] The new administrative law judge increased the attorney's fee award to $4,000. The claimant again appealed to the Board, contending that the award was still inadequate. The Board modified the fee award to $6,215. Both parties thereafter petitioned this court for review of the Board's order. The claimant contends that the Board should have included the employer's trust fund contributions in computing her husband's average weekly wage; the company contends that the Board's modification of the attorney's fee award was clearly erroneous.
 
 
 6
 * We address first the claimant's contention that the fringe benefits provided to her husband by means of the company's contributions to the union trust funds are a part of her husband's "average weekly wage" within the meaning of the Act. This issue has apparently not been addressed before. We begin our analysis with the specific language of the statute.
 
 
 7
 The term "wages" is defined at section 2(13) of the Act:
 
 
 8
 "Wages" means the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the injury, including the reasonable value of board, rent, housing, lodging, or similar advantage received from the employer, and gratuities received in the course of employment from others than the employer.
 
 
 9
 33 U.S.C. § 902(13). We agree with the Board that this definition "clearly implies that values received by an employee that are readily identifiable and calculable should be included in the determination of the average weekly wage." App. I at 51. Thus, for example, vacation pay constitutes wages, Baldwin v. General Dynamics Corp., 5 BRBS 579, BRB No. 76-271 (March 15, 1977), as does overtime pay, Gray v. General Dynamics Corp., 5 BRBS 279, BRB No. 76-105 (December 21, 1976), although neither is explicitly mentioned in section 2(13).[5] The question, then, is whether the benefit fund contributions are identifiable, calculable values received by the employees. We hold that they are.
 
 
 10
 We recognize that, as Morrison-Knudsen emphasizes, the contributions are made to the union funds, not to the employees, and that the individual employees have no voice in the day-to-day operation of the funds. The company cannot seriously maintain, however, that because the union funds receive the contributions, then the funds are the beneficiaries of the company's payments. The beneficiaries are the employees. The funds are no more than a channel; they are merely a means by which the company provides life insurance, health insurance, retirement benefits, and career training for its employees.
 
 
 11
 Further, it is indisputable that each of these benefits has substantial economic value to the employees. If they were not provided at the company's expense, each employee would have to spend his or her own money to acquire them. The Board apparently felt that it would be impossible to determine the "value" to an employee of the insurance policies, the career training, or the pension because whether and to what extent the employee might use them is highly speculative. This reasoning ignores the fact that an insurance policy must be bought and paid for whether or not a claim is ever made upon it. The economic advantage lies in the employer's provisions of such a policy at no cost to the employee. See W. W. Cross v. NLRB, 174 F.2d 875, 878 (1st Cir. 1949).[6] The same is true of the retirement pension and the career training. With respect to the pension, we agree with the Michigan appellate court's statement in Hite v. Evart Products Co., 34 Mich.App. 247, 191 N.W.2d 136 (1971):
 
 
 12
 We may only speculate whether plaintiff would have worked a full 10 years for defendant (and thereby obtained a vested interest in the pension fund) had she not been injured. However, the facts are that at the time of the injury her employer was putting aside this potential benefit for her and that the injury prevented a continuation of this potential toward a vested interest. As the result of her injury she must find some other way of providing income for retirement. The pension payment was a part of her weekly wage.
 
 
 13
 191 N.W.2d at 139 (emphasis in original).[7] As for career training, that too is something the employee would have had to spend his or her own money to acquire. It is therefore as much an economic advantage as are the insurance policies and the pension. That an employee may choose not to participate in the career training opportunity does not make the opportunity any less valuable, for it is of course up to each employee to decide what to do with the consideration tendered by the employer in return for services rendered.
 
 
 14
 The Supreme Court's reasoning in United States v. Carter, 353 U.S. 210, 77 S.Ct. 793, 1 L.Ed.2d 776 (1957), is instructive. In Carter, the Court found contributions of seven and one-half cents per hour to a union health and welfare fund to be part of the "sums justly due" to employees under the Miller Act, 40 U.S.C. §§ 270a et seq., and held accordingly that a federal contractor's surety was liable for such contributions when the contractor failed to pay them. The Court stated:
 
 
 15
 It is undisputed that if the collective-bargaining agreement had required the contractor to pay each employee 71/2 cents per hour above the prevailing wage rate, and the employee had, by contract with his bargaining representative, agreed to contribute that sum to the fund, the surety would have been obligated to make good any default in the contractor's payment of that extra 71/2 cents per hour.
 
 
 16
 Id. at 217, 77 S.Ct. at 797. The same logic applies here. If Morrison-Knudsen paid the sixty-eight cents per hour to its employees, and the employees, in turn, paid this amount into the various funds, the sixty-eight cents per hour undoubtedly would be seen as part of the employees' wages. That result does not change simply because the company has agreed to eliminate two unnecessary steps by paying the contributions directly to the trust funds.
 
 
 17
 It may be true, as the Board observed, that the sixty-eight cents per hour "would in all likelihood not buy decedent's family similar kinds of protection," App. I at 52, but the possible inadequacy of the contributions is no reason to withhold them altogether. Moreover, we think the above quotation from the Carter case supports the conclusion that the most reasonable course is to measure the value of the fringe benefits by the amount of the employer's contributions to the benefit funds. We are not persuaded by the Board's concern that "if contributions to the various funds were included in the average weekly wage, it would appear that to (calculate compensation payments under) section 10B, one would have to find a fellow employee who not only worked similar hours at a similar wage scale, but who had a similar status vis a vis union funds as well." App. I at 52. Such fears are unfounded. The benefit fund contributions are made on a per-hour basis for each employee, without regard to the employee's "status vis a vis union funds." Thus, the contributions may be included in the average weekly wage under section 10(b) simply by determining the amount of the contributions made on behalf of the fellow employee who, having worked similar hours, serves as the referent in any event.
 
 
 18
 Finally, Morrison-Knudsen's reliance on United States v. Embassy Restaurant, 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d 601 (1959), is misplaced. There the Court held that, under the Bankruptcy Act, benefit fund contributions are not entitled to the priority given to "wages ... due to workmen." The Court emphasized, however, that the Bankruptcy Act gave priority strictly to wages, and that it was not intended to include additional forms of compensation. Id. at 35, 79 S.Ct. at 557. Here, by contrast, the Longshoremen's Act is expressly defined to include many forms of compensation within the concept of "wages." Further, the purpose of the Bankruptcy Act is to set a formula for distributing too few assets among too many creditors. Part of the Court's concern in Embassy Restaurant was that if contributions were given priority along with wages, "the workman (would) have to share with the welfare plan, thus reducing his own recovery." Id. at 34, 79 S.Ct. at 557. Such a consideration is wholly absent in the present context. The purpose of the Longshoremen's Act is to provide prompt compensation for injured employees or their families. Congress chose to carry out this design by including in the compensation formula all of the identifiable value, in whatever form it may appear, that the employee was receiving in return for his labor at the time of the injury. The Act is remedial, and we are obliged to construe it liberally, resolving doubts in favor of the claimant. See, e.g., Friend v. Britton, 220 F.2d 820 (D.C.Cir.1955). The strict construction given to the term "wages" in Embassy Restaurant is therefore inappropriate here.
 
 
 19
 In conclusion, it is clear that if the value received by the employee is reasonably identifiable and calculable, then it must be included in the average weekly wage of the employee. We hold that the fringe benefits at issue here amount to value received by the employees, and that it is reasonable to measure such value by the amount of the employer's contributions to the various fringe benefit funds. Therefore, those contributions must be included as part of the employee's average weekly wage in computing the compensation due under the Act. Accordingly, that part of the Board's decision concerning fringe benefits is reversed.
 
 II
 
 20
 In its cross-petition for review of the Board's order, the company contends that the Board erred in modifying the amount of attorney's fees awarded by the administrative law judge. As the Board stated:
 
 
 21
 After careful review and consideration of the entire record ..., we find that the administrative law judge's award of the attorney's fee herein is an abuse of discretion and contrary to law. Normally, the Board would remand this case to the administrative law judge for a second time for reconsideration; however, since Judge Thomas' Decision was of necessity based only upon a review of the records, as would be any subsequent decision he could render, in the interest of administrative economy the Board modifies the attorney's fee award to $6215.00....
 
 
 22
 The fee award made by the administrative law judge was for services performed in connection with the proceedings before him. The pertinent regulation provides as follows:
 
 
 23
 An attorney or other representative seeking a fee for services performed on behalf of a claimant with respect to claims filed under the Act shall make application thereof to the persons, administrative body, or court before whom the services were performed.
 
 
 24
 20 C.F.R. § 701.132 (emphasis added). The company contends that the Board, in modifying a fee award for services performed before the administrative law judge, violated its own regulation. We disagree.
 
 
 25
 Initially, we note that the claimant's attorney complied with the requirement set out in the regulation: her attorney applied to the administrative law judge for attorney's fees for services performed before him, and to the Board for services performed before it.[8] Nothing in the regulation prohibits the Board from reviewing or revising the award set by the administrative law judge.
 
 
 26
 It is clear that the Board has the authority to review and reverse an administrative law judge's fee award if that award was an abuse of discretion. Director, Office of Workers' Compensation Programs v. United States Steel Corp., 606 F.2d 53, 55 (3d Cir. 1979). The issue presented in the instant case is, however, more difficult: can the Board modify a fee award set by an administrative law judge rather than remand the case if the Board finds that award to be erroneous and an abuse of discretion. We find that the Board had such authority in this case where the determination of attorney's fees was properly based solely on the record, and the complete record was before the Board.[9] In its order, the Board discussed the factors to be considered in determining a fee award and applied those factors to the information contained in the record regarding attorney's fees. We therefore agree with the Board that since the full record was before it, the policies of administrative economy and a speedy resolution of this claim were furthered by the Board's decision to modify the fee award rather than remand for a second time to the administrative law judge. Accordingly, we affirm the Board's award of attorney's fees.
 
 
 27
 The order appealed from is affirmed in part and reversed in part, and the case is remanded to the Benefits Review Board for further proceedings consistent with this opinion.
 
 
 
 *
 Of the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. 291(a)
 
 
 [1]
 Morrison-Knudsen's insurer, the Argonaut Insurance Company, is also a respondent here
 
 
 [2]
 Under section 9 of the Act, death benefits are computed by reference to the average weekly wage of the deceased employee
 
 
 [3]
 The relevant statutory language of section 10(b) reads:
 Determination of pay
 Except as otherwise provided in this chapter, the average weekly wage of the injured employee at the time of the injury shall be taken as the basis upon which to compute compensation and shall be determined as follows:
 (b) If the injured employee shall not have worked in such employment during substantially the whole of such year, his average annual earnings, if a six-day worker, shall consist of three hundred times the average daily wage or salary, and, if a five-day worker, two hundred and sixty times the average daily wage or salary, which an employee of the same class working substantially the whole of such immediately preceding year in the same or in similar employment in the same or a neighboring place shall have earned in such employment during the days when so employed.
 
 
 [4]
 The original administrative law judge had since left the Department of Labor
 
 
 [5]
 Similarly, transportation provided by the employer has been held to constitute "wages" under a state workers' compensation statute. Leslie v. Reynolds, 179 Kan. 422, 295 P.2d 1076, 1083 (1956)
 
 
 [6]
 In W. W. Cross v. NLRB, 174 F.2d 875 (1st Cir. 1949), the First Circuit held that contributions to a group health insurance plan were "wages" for purposes of the mandatory bargaining provision of the NLRA as amended, 29 U.S.C. §§ 151 et seq. The court stated:
 (T)he word "wages" in § 9(a) of the Act embraces within its meaning direct and immediate economic benefits flowing from the employment relationship. And this is as far as we need to go, for so construed the word covers a group insurance program for the reason that such a program provides a financial cushion in the event of illness or injury arising outside the scope of employment at less cost than such a cushion could be obtained through contracts of insurance negotiated individually.
 Id. at 878. See also Inland Steel v. NLRB, 170 F.2d 247 (7th Cir. 1949).
 
 
 [7]
 We have discovered only one other state court case that addresses the issue whether benefit fund contributions are part of an employee's average weekly wage for purposes of a workers' compensation statute. That case, Still v. Industrial Comm'n, 27 Ariz.App. 142, 551 P.2d 591 (1976), is in direct conflict with the Michigan court's holding in Hite, quoted in the text above. In Still, the Arizona court viewed benefit fund contributions as akin to year-end bonuses, in that the amount the employer paid per hour worked by each employee remained the same without regard to the employee's rank or rate of pay. The court concluded that the contributions did not constitute wages because they were not the result of the employee's "individual effort," but rather resulted from the "collective effort" of the union's negotiations with the employer. With respect, we find this "individual effort" analysis unhelpful. It is immaterial that the benefits were obtained through the collective bargaining process, or that the benefits do not change according to job classification or seniority while rates of pay do change according to those criteria. The fact remains that the employer has agreed to furnish the employees with valuable benefits, in addition to hourly rates of pay, in return for the employees' services. The contributions are an important part of the employees' total compensation, and an equally important part of the employer's labor cost
 
 
 [8]
 The fees awarded by the Board for services performed in connection with proceedings before it are not at issue in this appeal
 
 
 [9]
 The instant case is distinguishable from Director, Office of Workers' Compensation Programs v. United States Steel Corp., 606 F.2d 53 (3d Cir. 1979). In that case, the Board modified the fee award set by the administrative law judge, and the court of appeals reversed, finding that the Board exceeded its authority in modifying the award because the record did not contain "sufficient findings" on which the Board could have based its determination of the award. The court noted, however, that it was not deciding "the question of whether the Board may, when presented with a full factual record, draw an appropriate conclusion from that record." Id. at 56 n.12
 The other cases cited by the company are also inapposite. In Ayers S.S. Co. v. Bryant, 544 F.2d 812 (5th Cir. 1977), the claimant's attorney apparently applied to the court for fees for services performed before the court and the administrative law judge. The court refused to award fees for work performed before the administrative law judge. The court did not discuss the question whether a fee award is subject to modification by the reviewing body. Similarly, in Newport News Shipbuilding & Dry Dock Co. v. Director, Office of Workers' Compensation Programs, 594 F.2d 986 (4th Cir. 1979), the court held that, according to the regulation, the claimant's attorney must apply separately to the deputy commissioner, administrative law judge, Board, or the court for fees generated by services performed before that person or body.